RONALD A. TIMMERMAN *et al.*, Plaintiffs-Appellees, v. GRAIN EXCHANGE, LLC, *et al.*, Defendants-Appellants.

Fifth District    No. 5—08—0404

Opinion filed August 21, 2009.—Rehearing denied September 29, 2009.

Andrew A. Honegger and Jeffrey Alan Ryva, both of Husch, Blackwell, Sanders LLP, of Peoria, for appellant Consolidated Grain & Barge Company.

Robert T. Bruegge, of Edwardsville, for appellant The Grain Exchange, LLC.

James P. Martin, of Polsinelli Shalton Flanigan Suelthaus PC, of St. Louis, Missouri, for appellee Joe Schmeink.

David M. Foreman, of Foreman & Kessler, Ltd., of Salem, for appellee Ronald A. Timmerman.

Brian R. Kalb, Christopher W. Byron, and Christopher J. Petri, all of Bryon Gerber Petri & Kalb, LLC, of Edwardsville, for appellee Lyle R. Twenhafel.

James P. Lawson, of Hasselberg, Williams, Grebe, Snodgrass & Birdsall, of Peoria, for *amicus curiae* Grain and Feed Association of Illinois.

Jerry D. Cavanaugh, of Springfield, for *amicus curiae* Community Bankers Association of Illinois.

JUSTICE WELCH delivered the opinion of the court:

On various dates prior to February 2008, The Grain Exchange, LLC (Grain Exchange), entered into contracts with the farmers (the plaintiffs) in these three consolidated cases for the delivery of specified amounts of grain at set prices on set future dates. Prior to the dates set for delivery, Grain Exchange's license to deal in grain was revoked by the Illinois Department of Agriculture, making it illegal for Grain Exchange to take delivery of the grain pursuant to the contracts. Shortly after the revocation of its license, Grain Exchange assigned all the contracts to Consolidated Grain & Barge Company, doing business as Granite Grain of Cahokia (Consolidated Grain). In the meantime, the prices of grain had risen, making the contracts less favorable for the plaintiffs.

The plaintiffs filed in the circuit court of Clinton County complaints against Grain Exchange and Consolidated Grain (collectively referred to as the defendants) for declaratory judgments that their contracts with Grain Exchange were rendered unenforceable at the moment Grain Exchange's license to deal in grain was revoked, making the assignments of the contracts to Consolidated Grain ineffective. The circuit court entered a declaratory judgment in favor of the plaintiffs, finding that the contracts became unenforceable at the moment Grain Exchange lost its license to deal in grain and could not thereafter be legally assigned to Consolidated Grain.

Two issues are presented for our review: whether the circuit court erred in denying the defendants' motions to stay the proceedings and compel arbitration based on certain language in the contracts and whether the circuit court erred in declaring the contracts unenforceable and the assignments ineffective based on the revocation of Grain Exchange's license to deal in grain. We will set forth the pertinent facts within the discussion of each issue. We turn first to the arbitration issue.

■ Each of the contracts is one page in length, with all of its terms and conditions on one side of the page. All were drafted by Grain Exchange. Most of the contracts contain a provision that states, "Unless otherwise agreed to, this contract is subject to the Rules of the National Grain and Feed Association[ ] and, to the extent not in conflict with aforesaid rules, by the Uniform Commercial Code." Others, however, contain no such language and no reference either to the National Grain and Feed Association Rules or to arbitration.

The National Grain and Feed Association Rules (hereinafter the Rules) are not set forth in the contracts, and no specific reference to arbitration is included in the contracts. Copies of the Rules were not provided to the plaintiffs by Grain Exchange, nor were the plaintiffs informed by Grain Exchange where they could obtain copies of the Rules. The plaintiffs were not informed that the Rules required the arbitration of any disputes. Nevertheless, the Rules contain an arbitration provision, which states as follows:

> "Where a transaction is made subject to these rules in whole or in part, whether by express contractual reference or by reason of membership in this Association, then the sole remedy for resolution of any and all disagreements or disputes arising under or related to the transaction shall be through arbitration proceedings before the National Grain and Feed Association pursuant to the NGFA Arbitration Rules; provided, however, that at least one party to the transaction must be a [sic] NGFA member entitled to arbitrate disputes under the NGFA Arbitration Rules."

Both the defendants were members of the National Grain and Feed Association; none of the plaintiffs were.

The plaintiffs and Grain Exchange had done business together for several years. In most cases, the quantity, price, and terms of delivery were established by verbal orders, at group meetings, in person or over the phone. Grain Exchange then followed up by sending the one-page contract to the plaintiffs for their execution and return. The "old form" contracts, which had historically been used between Grain Exchange and the plaintiffs, contained no reference to arbitration or to the Rules. The "new form" contracts, the use of which began shortly before the revocation of Grain Exchange's license, contained the aforementioned language referencing the Rules but failing to mention arbitration.

The defendants filed motions to stay the proceedings and compel arbitration based on the foregoing reference in the contracts to the Rules and, with respect to those contracts which did not contain that reference, based on "trade usage" under the Uniform Commercial Code (810 ILCS 5/1—101 et seq. (West 2006)). The plaintiffs opposed the motions.

The circuit court denied the motions to stay proceedings and compel arbitration on the basis of procedural unconscionability, which it correctly defined as, " 'a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it' " (*Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100 (2006)). The court found that the plaintiffs did not have a reasonable opportunity to understand the terms of the contract because the Rules were not provided with the contracts and no specific reference to arbitration was made in the contracts. Accordingly, the circuit court found the alleged arbitration provision to be unenforceable based on procedural unconscionability. The defendants appeal. The determination of whether a contract or a portion of a contract is unconscionable is a question of law, which we review *de novo*. *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 22 (2006).

Procedural unconscionability consists of some impropriety during the process of forming the contract that deprives a party of a meaningful choice. *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 989 (1980). It refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and it also takes into account a lack of bargaining power. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100 (2006). "Factors to be considered are all the circumstances surrounding the transaction[,] including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and the negotiations relating to it are important, albeit not conclusive factors in determining the issue of unconscionability." *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 989-90.

In *Frank's Maintenance & Engineering, Inc.*, the clause in question was one limiting the contract drafter's liability for consequential damages. The court held that in order to be a part of the contract, the clause must, unless incorporated into the contract through prior course of dealings or trade usage, have been bargained for, be brought to the other party's attention, or be conspicuous. *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 990. The court held that the requirement that the drafter of the contract obtain the knowing assent of the other party to the clause in question " 'does not detract from the freedom to contract, unless that phrase denotes the freedom to impose the onerous terms of one's carefully drawn printed document on an unsuspecting contractual partner.' " *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 990, quoting *Johnson v. Mobil Oil Corp.*, 415 F. Supp. 264, 269 (E.D. Mich. 1976).

The court found the clause in question to be unconscionable because it "was not conspicuous and was not known to the plaintiff at the time the contract was made." *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 991. The clause in question was printed on the reverse side of the contract, and a clause directing the plaintiff's attention to the conditions printed on the reverse was stamped over, suggesting that the obscured language was irrelevant and could be ignored. *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 991-92. The court held that absent evidence tending to show that the clause had been negotiated by the parties and agreed to or that prior contracts between the parties had established a consistently adhered-to policy of excluding consequential damages or that a recognized trade practice, reasonable as applied to the plaintiff, had established such a policy, the clause could not be found to be conscionable. *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 992.

In *Razor*, 222 Ill. 2d at 100, a clause limiting consequential damages in a new car warranty was found to be unconscionable where the warranty was entirely preprinted and drafted by the defendant and the plaintiff had no hand in its drafting and no bargaining power at all with respect to its terms. More important to the court's finding of unconscionability was "the lack of evidence that the warranty, which contained the disclaimer of consequential damages, had been made available to the plaintiff at or before the time she signed the sale contract." *Razor*, 222 Ill. 2d at 100-01. "The warranty and its consequential damages exclusion were contained in the owner's manual, which was placed in the glove compartment of the car, where it was unavailable to the consumer until after she took delivery." *Razor*, 222 Ill. 2d at 101. No portion of the sale contract even mentioned the warranty or the exclusion of consequential damages, and the plaintiff testified that she never saw the warranty or the limitation on consequential damages until after she had signed the contract and driven the car off the lot. *Razor*, 222 Ill. 2d at 101. The warranty information, including the disclaimer of consequential damages, had not been made available to the plaintiff at or before the time she signed the contract. *Razor*, 222 Ill. 2d at 101. The court rejected the defendant's argument that the disclaimer was not procedurally unconscionable because it was written in large, plain, simple, and understandable language, because the plaintiff had no opportunity to see the language before entering into the contract. *Razor*, 222 Ill. 2d at 101. Accordingly, the court found the clause to be unconscionable and unenforceable. *Razor*, 222 Ill. 2d at 105.

In *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1 (2006), a procedural-unconscionability analysis was applied to an arbitration

clause in a wireless telephone service agreement, which contained a prohibition on class action arbitration, although the court found that it was not sufficiently procedurally unconscionable to render it unenforceable. In that case, the plaintiff signed the front page of the service agreement and initialed an acknowledgment provision on the front of the form which stated that she had read the terms and conditions on the back, where the arbitration provision was located. The court found that the terms and conditions of the contract were in the plaintiff's possession and that she either read them or could have read them if she had chosen to do so. *Kinkel*, 223 Ill. 2d at 26. Nevertheless, the prohibition on class action arbitration was found to be unenforceable based on the cumulative effect of both procedural unconscionability and substantive unconscionability. *Kinkel*, 223 Ill. 2d at 42; see also *Wigginton v. Dell, Inc.*, 382 Ill. App. 3d 1189 (2008).

In the case at bar, the circuit court noted that the term "arbitration" was not even mentioned in the contracts. The court found that, while important terms were not hidden in a maze of fine print, the Rules had not been provided with the contracts and the contracts did not mention arbitration. Based on the totality of the circumstances surrounding the execution of the contracts, the court found the alleged arbitration provision to be procedurally unconscionable and unenforceable.

The defendants correctly argue that Illinois law favors the enforcement of agreements to arbitrate disputes (*Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, 443 (1988)) and that "[p]arties who execute a contract containing a valid arbitration clause are irrevocably committed to arbitrate all disputes clearly arising under the agreement." *TDE Ltd. v. Israel*, 185 Ill. App. 3d 1059, 1063 (1989). Nevertheless, the circuit court found that the parties at bar did not execute a contract containing a valid arbitration clause because any such clause was procedurally unconscionable.

The defendants correctly argue that a contract may incorporate by reference an arbitration provision contained in another document if the contract shows that intent. See *Turner Construction Co. v. Midwest Curtainwalls, Inc.*, 187 Ill. App. 3d 417, 421 (1989). In *Turner Construction Co.*, 187 Ill. App. 3d at 419, a construction subcontract was held to have incorporated by reference an arbitration provision contained in the general contract, where the subcontract expressly stated that the general contract was " 'available for examination by the Subcontractor at all reasonable times at the office of' " the general contractor and that the subcontractor " 'represents and agrees that it has carefully examined and understands' " the general contract.

*Turner Construction Co.* is clearly distinguishable from the case at bar, where the contracts did not so clearly manifest an intent to incorporate by reference the arbitration provision contained in the Rules. In the case at bar, the Rules were not set forth in the contracts and had not been provided to or made available for inspection by the plaintiffs prior to the execution of the contract, and the plaintiffs did not represent and agree that they had carefully examined and understood the Rules. The circuit court found that, to the extent the contracts in the case at bar sought to incorporate by reference the arbitration provision of the Rules, that attempt was procedurally unconscionable where those Rules were not included in the contracts and had not been provided to or made available to the plaintiffs prior to the execution of the contracts and the contracts themselves did not mention arbitration.

The defendants also rely on *Bunge Corp. v. Williams*, 45 Ill. App. 3d 359, 365 (1977), in which the court found binding agreements to arbitrate disputes contained in purchase contracts between a grain elevator and soybean producers. The producers had argued that they did not consent to arbitration because the elevator had not called their attention to the arbitration provisions on the reverse side of the contracts which they signed. They claimed that they had never read the provisions, that they had never even heard of arbitration, and that they did not intend by signing the contracts to agree to arbitration. They argued that the provisions for arbitration were unconscionable.

The contracts in question contained, approximately one-quarter inch from the signature line on the front of the contract, in large boldfaced capital letters, the following notice: "THE TERMS APPEARING ON THE BACK HEREOF ARE A PART OF THIS CONTRACT." On the back of the contract was the arbitration provision, which stated that all disputes and controversies with respect to the contract would be arbitrated according to the Rules. The court rejected the producers' unconscionability arguments, noting, "They had had ample opportunity to read the contracts and to know their every term." *Bunge Corp.*, 45 Ill. App. 3d at 364.

Again, the facts of *Bunge Corp.* are clearly distinguishable from those of the case at bar. The contracts in the case at bar did not themselves mention arbitration, and the Rules, which contained the arbitration provision, had not been provided to or made available to the plaintiffs before they signed the contracts. The contracts in the *Bunge Corp.* case explicitly provided for the arbitration of all disputes and controversies, and the arbitration provision was brought to the producers' attention by virtue of prominent language located just above the signature line. In *Bunge Corp.*, all the producers had to do

to learn of the arbitration provision was to read the contract they were signing. In the case at bar, the plaintiffs could only learn of the arbitration provision if they did independent research in order to find and read the Rules. Even so, the Rules themselves, which can only be found on the Internet, do not draw attention to the arbitration provision, which is the twenty-ninth rule in 61 pages of dual column, single-spaced, fine print, with no demarcations differentiating it from other rules or drawing attention to it.

We find the facts of the case at bar to be similar to those of *Frank's Maintenance & Engineering, Inc.* and *Razor*, on which the circuit court relied. The contracts themselves made no direct mention of arbitration. The Rules were not set forth in the contracts, nor had they been provided to or made available to the plaintiffs prior to their entering into the contracts. The plaintiffs were not directed to where to find the Rules. There is no indication that the arbitration provision had been negotiated between the parties. The arbitration provision of the contract was so difficult to find and read that the plaintiffs cannot fairly be said to have been aware that they were agreeing to it. See *Razor*, 222 Ill. 2d at 100. The circuit court did not err in so finding.

We are not entirely unsympathetic to the defendants' argument that once the Rules were referenced in the contract, it was the responsibility of the plaintiffs to understand them or inquire further before entering into the contracts. See *Bunge Corp.*, 45 Ill. App. 3d at 365 (" 'the law requires men, in their dealings with each other, to exercise proper vigilance and give their attention to those particulars which may be supposed to be within reach of their observation and judgment and not to close their eyes to the means of information which are accessible to them' "), quoting *Vargas v. Esquire, Inc.*, 166 F.2d 651, 654 (7th Cir. 1948). The defendants point out that the plaintiffs are not consumers buying a car, as was the plaintiff in *Razor*, but are experienced merchants in the business of selling their grain through grain contracts. Nevertheless, as the circuit court stated, using language from *Kinkel*, 223 Ill. 2d at 23, and *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 990, the mere fact that the plaintiffs are businessmen does not justify the use of unfair surprise to the detriment of one of the parties. The circuit court did not err in finding that the arbitration provision of the contracts was so difficult to find and read that the plaintiffs cannot fairly be said to have been aware that they were agreeing to it and that it was therefore unconscionable and unenforceable.

Finally, with respect to those contracts which did not include the provision referencing the Rules, the defendants argue that the parties to those contracts were bound to arbitrate disputes by "usage of trade"

as defined in section 1—205(2) of the Uniform Commercial Code, which provided at that time as follows:

"A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation[,] or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing[,] the interpretation of the writing is for the court." 810 ILCS 5/1—205(2) (West 2006) (now see 810 ILCS 5/1—303(c) (West 2008)).

The defendants argue that if the Rules are a usage of trade in the grain and feed industry, then they are included in the parties' contracts notwithstanding the fact that there was no mention of arbitration or the Rules in some of those contracts.

We reject the defendants' argument because they failed to prove as a matter of fact that the arbitration provision of the Rules was a "practice or method of dealing having such regularity of observance in a place, vocation[,] or trade as to justify an expectation that it will be observed with respect to the transaction in question." 810 ILCS 5/1—205(2) (West 2006). The trial court's factual finding that there was no such "usage of trade" is not contrary to the manifest weight of the evidence. See *In re Estate of Shea*, 364 Ill. App. 3d 963, 971 (2006) (an appellate court reviews a circuit court's findings of fact to ensure they are not contrary to the manifest weight of the evidence).

The defendants argue that at the hearing on their motion to compel arbitration they were erroneously prevented by the circuit court from presenting evidence of usage of trade because the circuit court refused their request to call the plaintiffs as witnesses, due to the defendants' failure to serve notice pursuant to Supreme Court Rule 237(b) (210 Ill. 2d R. 237(b)). The defendants argue that this constituted an abuse of the circuit court's discretion. We find no abuse of discretion. See *Fronabarger v. Burns*, 385 Ill. App. 3d 560, 564 (2008) (a trial court's decision to admit evidence will not be reversed absent an abuse of discretion).

Although some of the plaintiffs were voluntarily present in court during the hearing, they had no prior notice that they might be called to testify by the defendants. Although a notice pursuant to Rule 237(b) might not have been necessary to compel their appearance in court, they were certainly entitled to be notified in advance that they would be called to testify. The circuit court has authority and discretion to limit evidence in order to prevent undue surprise to either party. Indeed, at the relevant time section 1—205(6) of the Uniform Commercial Code specifically provided, "Evidence of a relevant usage of

trade offered by one party is not admissible unless and until he has given the other party such notice as the court finds sufficient to prevent unfair surprise to the latter." 810 ILCS 5/1—205(6) (West 2006).

In its oral pronouncement on the motion, the circuit court found that the plaintiffs did not know that the arbitration requirement existed until after they had filed their lawsuits. This finding is supported by the affidavits of the plaintiffs, filed in opposition to the motion, stating that they had no knowledge of the contents of the Rules prior to this litigation and that they had never used arbitration to resolve any dispute or heard of any other farmer doing so. The defendants failed to prove as a matter of fact that the arbitration provision of the Rules was incorporated into the contracts through usage of trade. The circuit court's finding in this regard is not contrary to the manifest weight of the evidence.

■ We turn now to the second issue presented for our review—the propriety of the declaratory judgment entered in favor of the plaintiffs, finding that their contracts with Grain Exchange became unenforceable at the moment Grain Exchange lost its license to deal in grain and that therefore the contracts could not have been legally and effectively assigned to Consolidated Grain. "The grant or denial of a request for a declaratory judgment is subject to *de novo* review to the extent it is not based on factual determinations that are the trial court's province." *Inland Land Appreciation Fund, L.P. v. County of Kane*, 344 Ill. App. 3d 720, 724 (2003). Because there are no facts in dispute and this presents solely a question of law, we review the issue *de novo.*

Those engaged in the business of buying and/or storing grain are strictly regulated by the Illinois Grain Code (240 ILCS 40/1—1 *et seq.* (West 2006)), administered by the Illinois Department of Agriculture. The Grain Code recognizes, "[T]he Illinois grain industry comprises a significant and vital part of the State's economy and as such can function to its fullest competitive and profitable potential, thus contributing to the economic health of this State, when it operates under a coordinated and integrated regulatory structure." 240 ILCS 40/1—5 (West 2006). The stated purpose of the Grain Code is as follows:

> "to promote the State's welfare by improving the economic stability of agriculture through the existence of the Illinois Grain Insurance Fund in order to protect producers in the event of the failure of a licensed grain dealer or licensed warehouseman and to ensure the existence of an adequate resource so that persons holding valid claims may be compensated for losses occasioned by the failure of a licensed grain dealer or licensed warehouseman." 240 ILCS 40/ 1—5 (West 2006).

A further purpose is "to provide a single system of governmental regulation of the Illinois grain industry." 240 ILCS 40/1—5 (West 2006).

The Grain Code requires that any person engaged in the business of buying grain from producers or storing grain for compensation in the State of Illinois be licensed by the Department of Agriculture. 240 ILCS 40/5—5(a) (West 2006). Engaging in the business of a grain dealer or warehouseman without a license is a Class A misdemeanor. 240 ILCS 40/15—45(f) (West 2006). A license may be revoked at the discretion of the Department of Agriculture if the dealer or warehouseman fails to meet the strict requirements of the Grain Code and the Department of Agriculture. 240 ILCS 40/15—40(b) (West 2006). This is what happened to Grain Exchange.

All the contracts between the plaintiffs and Grain Exchange were entered into prior to February 2008, at a time when Grain Exchange had a valid grain dealer's license. The contracts all called for the delivery of grain sometime after June 2008. Effective March 3, 2008, the Illinois Department of Agriculture revoked Grain Exchange's license. It is undisputed that Grain Exchange did not attempt to assign its contracts with the plaintiffs to Consolidated Grain until after the revocation of its license.

Before the circuit court, the plaintiffs argued that the contracts between the plaintiffs and Grain Exchange became illegal at the moment Grain Exchange lost its license to deal in grain and that they were therefore unenforceable by either party and could not legally have been assigned by Grain Exchange to Consolidated Grain. The defendants argued that the issue should be analyzed under the law of repudiation and that the court should determine whether there was a manifestation by Grain Exchange of an intent not to perform the contracts on the date of performance. The defendants argued that because Grain Exchange indicated an intent to delegate its performance by assigning the contracts to Consolidated Grain, it could not be held to have repudiated the contracts.

After hearing the evidence and argument of the parties, the circuit court held that a grain dealer who has lost its license to deal in grain may not thereafter legally assign the contracts to another dealer. The court held that at the time of the attempted assignment the contracts were void and could not be legally assigned. Accordingly, the circuit court entered a summary judgment in favor of the plaintiffs.

The defendants argue that the circuit court erred in finding the contracts void based on illegality rather than considering whether Grain Exchange had effectively repudiated the contracts when its license to deal in grain was revoked. The defendants argue that had

the court applied the law of repudiation, it would have reached the conclusion that Grain Exchange had not repudiated the contracts and that they had been legally and effectively assigned to Consolidated Grain. Before we proceed any further, a brief discussion of the law of repudiation is in order.

An anticipatory repudiation is said to have occurred where one party to a contract has clearly, definitely, and unequivocally manifested an intent not to perform the contract on the date of performance. *In re Marriage of Olsen*, 124 Ill. 2d 19, 24 (1988). "The failure of the breaching party must be a total one which defeats or renders unattainable the object of the contract." *In re Marriage of Olsen*, 124 Ill. 2d at 24. As the defendants point out in their brief, the comment to section 2—610 of the Uniform Commercial Code, which deals with anticipatory repudiation, states, "[A]nticipatory repudiation centers upon an overt communication of intention *or an action which renders performance impossible* or demonstrates a clear determination not to continue with performance." (Emphasis added.) 810 ILCS Ann. 5/2—610, Uniform Commercial Code Comment, at 390 (Smith-Hurd 1993). In such a case the other party to the contract may treat the contract as ended. *Leazzo v. Dunham*, 95 Ill. App. 3d 847, 849 (1981). Whether an anticipatory repudiation has occurred is a question of fact, and the judgment of the circuit court thereon will not be disturbed unless it is against the manifest weight of the evidence. *Truman L. Flatt & Sons Co. v. Schupf*, 271 Ill. App. 3d 983, 987 (1995). Whether a repudiation has occurred is determined on a case-by-case basis. *Schupf*, 271 Ill. App. 3d at 987.

Grain Exchange argues that at no time did it manifest an intent not to perform the contracts on the dates set for performance. Instead, it argues that at all times it intended to perform by delegating its performance to Consolidated Grain, as it is permitted to do under section 2—201 of the Uniform Commercial Code (810 ILCS 5/2—210 (West 2006)). We hold that, even applying the law of repudiation as the defendants insist, the result remains the same.

The plaintiffs' contracts with Grain Exchange were effectively repudiated at the moment Grain Exchange lost its license to deal in grain. The contracts were repudiated by *"an action which render[ed] performance impossible"* (emphasis added) (810 ILCS Ann. 5/2—610, Uniform Commercial Code Comment, at 390 (Smith-Hurd 1993)), and from that moment onward the plaintiffs were justified in treating the contracts as ended. See *Leazzo*, 95 Ill. App. 3d at 849. Had Grain Exchange assigned the contracts prior to its loss of license—that is, prior to the happening of an act which effectively repudiated the contract—the plaintiffs might have been bound by the assignments.

However, once Grain Exchange lost its license to deal in grain, the contracts were effectively repudiated, the plaintiffs were no longer bound thereby, and no assignment of the contracts could bind the plaintiffs.

This is essentially the analysis conducted by the court in *In re C&S Grain Co.*, 47 F.3d 233 (7th Cir. 1995), a case heavily relied on by the plaintiffs before the circuit court and on appeal. C&S Grain Company was an Illinois grain dealer that was unable to comply with the conditions of its grain dealer's license and finally surrendered its license to the Department of Agriculture. Thereafter, C&S Grain Company filed for chapter 11 bankruptcy. Several parties sought in the bankruptcy court to be excused from their contracts to deliver and sell grain to C&S Grain Company at a specified price at a future date, contracts similar to those involved in the case at bar. The bankruptcy court declared the contracts void for illegality because, upon the relinquishment of its license to deal in grain, C&S Grain Company was no longer authorized to perform the contracts. Like Grain Exchange in the case at bar, C&S Grain Company sought to perform the contracts by assigning them to entities capable of performing the underlying obligations. The bankruptcy court refused.

On appeal, the district court pointed out that the Bankruptcy Code (11 U.S.C. §§365(a), (f)(1) (1994)) does allow debtors to assume and assign *executory* contracts but that if the contracts in question had been completed or terminated before the bankruptcy filing, they were no longer executory and could not be assigned. *In re C&S Grain Co.*, 47 F.3d at 237. The court held that where the debtor has breached the contract prior to the bankruptcy filing with the result that the other party has no further duty to perform, the contract is no longer executory and cannot be assigned. *In re C&S Grain Co.*, 47 F.3d at 237. The court continued as follows:

> "In Illinois, once a statute imposes licensure as a precondition for operation and provides a penalty for its violation, a contract for the unlicensed performance of that act is void. [Citations.] Therefore implicit in every grain contract entered into by C & S Grain was an assurance that it was licensed to deal and store grain. But by surrendering its licenses to the Department, C & S Grain declared itself unable to perform and effectively repudiated its contractual obligations. Upon one party's anticipatory repudiation, the other party is entitled to rescind the contract for all purposes of performance." *In re C&S Grain Co.*, 47 F.3d at 237.

The court concluded that the parties with whom C&S Grain Company had contracted were relieved of their duties to perform when C&S Grain Company relinquished its license. Because the contracts were

no longer executory, they could not be assigned by the debtor. Accordingly, the bankruptcy court's decision was affirmed. *In re C&S Grain Co.*, 47 F.3d at 237.

Applying a similar analysis to the case at bar, we reach a similar result. Upon the loss of Grain Exchange's license to deal in grain, it could no longer perform the contracts. This constituted an anticipatory repudiation of the contracts because performance by Grain Exchange was impossible. It makes no difference that Grain Exchange had not voluntarily surrendered its license as C&S Grain Company did. The result is the same—performance became impossible and the contracts were repudiated. At that point, the plaintiffs were no longer bound thereby and no assignment by Grain Exchange could bind them to the contracts. Whether the contracts were "void for illegality" or no longer enforceable due to anticipatory repudiation, the result is the same. Because we can affirm the circuit court on any basis appearing in the record (*Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983)), we do so here.

The defendants argue that despite the loss of Grain Exchange's license, it did not repudiate the contracts because it clearly manifested an intent to perform the contracts by assigning them to Consolidated Grain. This might be true had Grain Exchange assigned the contracts prior to its loss of license—that is, prior to the happening of an act which effectively repudiated the contract. Upon the loss of Grain Exchange's license to deal in grain, the contract was effectively repudiated by an action that rendered performance impossible, and the plaintiffs were justified in treating the contracts as ended. The circuit court did not err in granting a declaratory judgment in favor of the plaintiffs.

For the foregoing reasons, the judgment of the circuit court of Clinton County is hereby affirmed.

Affirmed.

WEXSTTEN, P.J., and GOLDENHERSH, J., concur.