In the

# United States Court of Appeals
## For the Seventh Circuit

No. 09-3560

ARLINGTON LF, LLC,

*Appellant*,

*v.*

ARLINGTON HOSPITALITY, INC., et al.,

*Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 5098—**James B. Zagel**, *Judge*.

ARGUED SEPTEMBER 29, 2010—DECIDED MARCH 3, 2011

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. This is a bankruptcy case with a complicated factual and procedural background, but one that boils down to a simple question: who breached the parties' post-petition financing agreement? Arlington Hospitality, Inc. and its subsidiaries ("Arlington"), operators of the AmeriHost hotel chain, filed for Chapter 11 bankruptcy in August 2005. Arlington needed funds in

order to meet its obligations during the pendency of the bankruptcy proceeding, and to that end entered into a post-petition financing agreement on the eve of the bankruptcy filing with Arlington LF, LLC ("LF"), a single-purpose entity that had been created for that purpose. LF lent Arlington $3.53 million under the agreement, but shortly thereafter, relations between the parties soured. LF began to have misgivings about its role as a post-petition lender and signaled that it did not wish to make further loans, while Arlington did not pay certain fees associated with the loan. Shortly thereafter, Arlington's assets were successfully sold in the bankruptcy proceeding, and Arlington repaid LF the full $3.53 million it had borrowed, with interest. LF, believing it was still owed the additional fees Arlington had not paid, filed a motion in the bankruptcy court to recover them, along with additional default interest. Arlington, believing it had met all of its obligations and owed nothing more to LF, opposed the request. The bankruptcy court held a trial on the matter and ruled in Arlington's favor, concluding that LF had breached the agreement. The district court reversed and remanded, and the bankruptcy court ruled for LF on the second go-round. The district court again reversed, this time on a different basis, with instructions to the bankruptcy court to rule in Arlington's favor. LF appeals to us. We conclude that LF repudiated the parties' agreement, and is not entitled to any additional fees or costs. We affirm.

## I. BACKGROUND

Arlington owned or leased thirty-six AmeriHost hotels located primarily throughout the midwestern United States. In order to meet its operating costs during off-seasons, it had for a number of years utilized a revolving line of credit with LaSalle Bank ("LaSalle"), secured by Arlington's assets. In 2005, Arlington began experiencing some financial difficulties and by that summer it owed approximately $3.5 million to LaSalle on the revolving credit loan and was having difficulty repaying it. That, coupled with litigation it was facing in Texas that had forced a subsidiary into bankruptcy, placed Arlington at serious financial risk. On the advice of an investment banking firm it had retained, Arlington decided that the best plan of action was to file for Chapter 11 bankruptcy and to begin soliciting potential purchasers of its assets and potential lenders to provide financing after a bankruptcy petition had been filed. One interested party was an entity called DH2, Inc. ("DH2"). Arlington and DH2 engaged in discussions about a potential purchase of Arlington's assets, along with debtor-in-possession ("DIP") financing during the pendency of the bankruptcy. DH2 had some concerns about the financing, because it had never engaged in DIP lending before, but decided to go forward because it wanted to preserve its ability to potentially purchase Arlington's assets. DH2 created a special-purpose entity to transact business with Arlington—Arlington LF, LLC ("LF")—and hours before Arlington filed its Chapter 11 petition, LF and Arlington signed an agreement called the "Outline of Terms and

Conditions for Total DIP Financing Facility" (the "Term Sheet").

### A. The Term Sheet and Interim Order

Pursuant to the Term Sheet, LF agreed to lend Arlington a total of $11 million. The parties referred to this overall amount as the "Total DIP Facility." The $11 million was divided into three separate parts: a $6 million revolving loan (the "Revolver" or the "Interim DIP Facility"), a $1 million "Term Loan A" that would be available after December 31, 2005, and a $4 million "Term Loan B" intended to fund certain real estate purchases by Arlington.[1] The Term Sheet set forth interest rates for the three loans and provided for a higher rate of default interest in the event that Arlington defaulted. The agreement also set forth various fees associated with the loan that Arlington agreed to pay. Two of these fees were a $100,000 "Total DIP Facility Commitment Fee" (the "Commitment Fee") and a $210,000 "Total DIP Facility Funding Fee" (the "Funding Fee"). The Term Sheet provided that these two fees were "payable immediately" to LF. The Term Sheet also provided that LF would be entitled to legal fees and other various expenses it incurred in connection with post-petition financing.

The parties submitted the Term Sheet to the Bankruptcy Court for approval on the first day of the bankruptcy

---

[1] Arlington never ended up utilizing either Term Loan A or B, and only ever drew on the Revolver.

proceedings pursuant to 11 U.S.C. §§ 364(c) and (d). The bankruptcy court entered an Interim Order approving the agreement on September 2, 2005, finding that the terms of the DIP financing had been negotiated in good faith and were fair and reasonable. The Interim Order largely adopted the terms of the parties' Term Sheet, but the two documents were not identical. Notably, while the Term Sheet had provided that Arlington could use the proceeds of the Revolver loan itself to pay the fees it would owe LF, the Interim Order stated that those fees had to be paid with *separate* funds, not drawn from the Revolver. Like the Term Sheet, the Interim Order provided that the $100,000 Commitment Fee and the $210,000 Funding Fee were "payable immediately" to LF. Other fees, in contrast, were payable "upon invoice" from LF.

Critically, the Interim Order also contained a paragraph requiring that LF give Arlington notice of any default and three business days to cure it (the "Notice Provision"). As the district court put it, the Notice Provision "created a condition precedent which must have occurred before LF stopped dealing with [Arlington]." Due to the Notice Provision, Arlington could not, conceptually, be in breach of the Interim Order until after it had been given notice and opportunity to cure it.

## B. LF Indicates It No Longer Wishes to Lend to Arlington

On September 7, five days after entry of the Interim Order, Arlington drew $3.53 million on the Revolver

and used it to pay off its obligations to LaSalle. It did not, however, pay either the Commitment Fee or the Funding Fee that were due immediately pursuant to the terms of the Interim Order. Arlington mistakenly believed that those fees were going to be paid through the Revolver draw itself—an assumption likely based on the fact that the parties' Term Sheet had provided for such an arrangement. LF, for its part, did nothing to seek payment of the two fees. It did not remind Arlington of its obligation to do so, nor did it utilize the Notice Provision procedure set forth in the Interim Order to inform Arlington of the potential default.

In the weeks that followed, the relationship between the parties began to take a downward turn, for reasons having nothing to do with the unpaid fees (it is not clear from the record that the fees were even on LF's radar screen in September). LF and Arlington were negotiating a potential asset purchase agreement, but the negotiations were proving fruitless. LF, fueled by doubts about the true value of Arlington's assets, began to have misgivings about purchasing them and had decided as early as September 16 that it was not likely to do so. At the same time, LF was becoming uncomfortable with its role as Arlington's post-petition lender.

On September 29, LF made these concerns explicit. That day, LF's general counsel, Richard Marks, had a phone call with an investment banker for Arlington, Richard Morgner, in which he said that LF was unwilling

to "fund any more money under the DIP."[2] Morgner relayed Marks's comments to his Arlington colleagues the next day, writing in an email that LF did "not wish to fund any more $ under the DIP."

If LF's intention not to follow through with any more DIP lending was not clear as of September 29, it was made crystal clear on October 4. The day before, a lawyer for Arlington's creditor committee[3] sent an email to LF's counsel asking whether it was in fact the case that LF did not intend to proceed with any additional DIP lending. LF's counsel wrote this in response:

---

[2] LF disputes this characterization of what Marks said, contending that all he said was that he did not "want" to fund any more money under the DIP. However, the bankruptcy court, having assessed all of the evidence in context, took Marks's statement as indicating LF was "unwilling" to lend more. We do not reverse such a factual finding even if we would have come out slightly differently. *Freeland v. Enodis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008). And in any event, we do not think there is as much of a difference between the meaning of "unwilling" and "want" as LF would like there to be. The meaning of what Marks was saying is clear: LF was not going to lend any more money to Arlington.

[3] The committee of Arlington's unsecured creditors (the "Creditor Committee") is also a party to this appeal and was closely involved in the proceedings below, as well as in the bankruptcy and related negotiations. Arlington and the Creditor Committee filed a single brief together, and just as in the proceedings below, their interests are aligned in opposing LF's motion. We refer to the Creditor Committee separately in this opinion only when it is necessary to do so.

> We are not willing to proceed further with the
> DIP loan; in other words, we will make no further
> loans to the Debtors. . . . We think the Debtor
> should find a new DIP lender to pay out our
> loan and fund the options that expire at the end
> of this month.

On October 6—after making these statements—LF for the first time sent Arlington anything that could be construed as a request that the fees be paid. On that date, an LF analyst sent Arlington's CFO a Statement of Account with a "Total Amount Due" of $456,216.87 in fees, which included the $100,000 Commitment Fee and the $210,000 Funding Fee. The Statement of Account also noted, in a separate section entitled "Account Summary," a $3.5 million outstanding loan balance, reflecting the draw Arlington had made on the $6 million Revolver, and noted a remaining "Loan Commitment Available" of approximately $2.5 million.

Arlington did not pay the October 6 Statement of Account. Two weeks later, on October 20, LF's counsel faxed Arlington's counsel a letter declaring Arlington to be in default for having failed to do so, and noted that several of the fees listed in the total amount due were payable immediately. Pursuant to the procedures set forth in the Interim Order, LF gave Arlington three business days to cure the default by paying the amount requested.

Shortly thereafter, on October 25, Arlington filed an asset purchase agreement in which a third party proposed to buy Arlington's assets. That same day, at a

hearing before the bankruptcy court, Arlington stated its belief that it had been "double-crossed" by LF because LF had stated that "they're just not going to fund anymore" and thus had "breach[ed] the agreement." On December 7, following an auction, the bankruptcy court approved the sale to the third party. On January 25, 2006, Arlington repaid LF the $3.5 million it had borrowed from the Revolver, along with interest. Arlington did not, however, pay any of the fees associated with the loan. LF, in response, filed a motion for payment of those sums, along with default interest, pursuant to 11 U.S.C. §§ 364(c)(1) and 503(b).

## C. The Litigation Below

Before making its way to us, LF's motion was ruled on by the bankruptcy court, remanded by the district court, ruled on again by the bankruptcy court, and again reversed by the district court. Explained below is a synopsis of these proceedings, which is summarized to highlight the relevant aspects of this appeal.

### 1. The First Bankruptcy Ruling

The bankruptcy court held a three day trial on LF's motion, involving five witnesses and numerous pages of exhibits. On May 10, 2007, the bankruptcy judge denied LF's request for fees and interest in a Memorandum Opinion and Order containing extensive findings of fact and conclusions of law. The court held that the Interim Order it had entered governed the parties, that LF's

September 29 and October 4 statements constituted an anticipatory breach of that agreement, and that having repudiated the agreement, LF was not entitled to recover the fees or expenses it sought. The bankruptcy court reasoned that at the point LF made the statements to the effect that it would no longer make any loans, "Arlington was entitled to consider its relationship with LF over and its duties of performance discharged. Having refused to perform under the agreement, LF cannot insist that Arlington continue to perform, paying interest and fees on a loan LF would not make." Notably, en route to reaching its conclusion, the bankruptcy court interpreted the Interim Order to mean that *all* fees owed to LF were payable "on invoice," despite the fact that the Order singled out the Commitment Fee and Funding Fee as "payable immediately."

### 2.  The First District Court Ruling

LF appealed the bankruptcy judge's ruling to the district court. The district court disagreed with the bankruptcy court's conclusion that all fees related to the DIP lending were only payable on invoice from LF, noting the separate paragraph in the Interim Order specifying that the Commitment and Funding Fees were payable immediately instead. The district court reasoned that Arlington, having failed to pay the fees that were due immediately upon entry of the Order on September 2, was therefore already in default by the time LF purportedly repudiated on September 29. And if Arlington was already in default as of that time, it

could not claim that LF had breached. The district court vacated the bankruptcy court's decision and remanded the matter for further proceedings. Critically, neither party raised, nor did the district court address, the fact that the Interim Order had a Notice Provision (described *infra*) whereby Arlington could only actually be in a cognizable breach after having been given notice and an opportunity to cure.

### 3.   The Second Bankruptcy Ruling

On remand in the bankruptcy court, Arlington and the Creditor Committee argued, *inter alia*, that it could not possibly have been in breach as of September 29, because LF had never followed the Notice Provision procedures set forth in the Interim Order.[4] The bankruptcy court agreed, concluding that the Notice Provision effectively created a condition precedent to LF enforcing the agreement, and that LF's failure to utilize it with regard to the unpaid Commitment and Funding Fees prevented LF from relying on any breach to justify its refusal to lend. But believing itself bound by the law of the case in light of the district court's ruling, the bankruptcy court

---

[4] Additional new arguments were also made to the bankruptcy court on the second go-round, which we do not address here, because the way we dispose of the appeal makes it unnecessary to do so. The additional arguments are summarized in the district court's second decision. *See Arlington Hospitality, Inc. v. Arlington LF, LLC*, 2009 WL 3055350, at *4 (N.D. Ill. Sept. 18, 2009).

felt it had to rule for LF, and did so, awarding LF $842,053 in fees plus default interest. This time, both parties appealed—Arlington appealing the award of fees, and LF believing it should have been awarded more.

### 4. The Second District Court Ruling

The case came back to the district court, which ruled that the bankruptcy judge had misunderstood the "narrow" scope of its first ruling. The district court stressed that its first holding was limited only to interpretation of the Interim Order regarding the payment of the "immediately" payable Commitment and Funding Fees. However, the district court stated that its ruling "did not require the Bankruptcy Court to find for LF under all circumstances." It noted that the Notice Provision argument made in the bankruptcy court on remand had not been raised in the district court previously, because "there was initially no reason for Debtor to raise the notice argument, and I certainly never considered that argument in the context of this case." Presented with the Notice Provision argument for the first time, the district court agreed with it, concluding that a breach by Arlington could only be effective *after* LF gave it notice and opportunity to cure. Because LF had not yet done so as of the time it repudiated the agreement on September 29, reasoned the district court, LF's repudiation of those statements caused the first breach. It was only after October 20, when Arlington did not pay the fees *after* finally being given the requisite notice, that any breach cognizable under the Interim Order could have

occurred. But by then, LF had already "walked away." The district court reversed the bankruptcy court's ruling and remanded with instructions to enter judgment in favor of Arlington. LF appealed to this court.

## II. ANALYSIS

Despite the complicated fits and starts below, the issue before us boils down to a relatively straightforward one: who breached the lending agreement? If LF committed an anticipatory breach of the agreement through the statements it made regarding its unwillingness to lend further, it is not entitled to the fees and interest. But if Arlington breached first (via nonpayment of the Commitment and Funding Fees), LF would be entitled to collect the fees and additional default interest it seeks. We conclude, like the bankruptcy court and district court did, that LF breached. While Arlington did indeed fail to pay certain fees "immediately due" under the Interim Order, by the time LF used the proper mechanisms that would have placed Arlington in violation, it had already repudiated the parties' agreement.

LF argues that neither its September 29 nor October 4 statements amounted to an anticipatory breach, and that even if they did, any breach was timely retracted days later when LF sent a Statement of Account to Arlington that it contends indicated a continued willingness to lend. LF further contends that Arlington did not detrimentally alter its position or suffer any harm in any way that would entitle it to raise any alleged breach as a defense to nonpayment of fees. It also argues that the

bankruptcy judge's opinions to the contrary ran afoul of Bankruptcy Rule 7052 because the court disregarded certain evidence and premised its conclusions on otherwise faulty findings.

We review the bankruptcy court's conclusions of law de novo and its factual findings for clear error. *In re Resource Tech. Corp.*, 624 F.3d 376, 382 (7th Cir. 2010). "If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, we will not reverse its factual findings even if we would have weighed the evidence differently." *Freeland v. Enodis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008) (citation and quotation omitted). Mixed questions of law and fact are subject to de novo review. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004).

### A. LF Repudiated the Parties' Agreement

On September 29, LF's general counsel told Arlington's investment banker that LF was unwilling to "fund any more money under the DIP." And on October 4, outside counsel for LF told counsel for Arlington's creditor committee that LF was "not willing to proceed further with the DIP loan; in other words, we will make no further loans to the Debtors. . . . We think the Debtor should find a new DIP lender to pay out our loan and fund the options that expire at the end of this month." We conclude that in making the statement it did on September 29 (a statement then verified and corroborated by the October 4 email), LF committed an anticipatory breach of the parties' lending agreement. These state-

ments demonstrated LF's intent not to perform any more of its lending obligations under the Interim Order.

Under Illinois law, a party commits an anticipatory repudiation when it manifests a clear, unequivocal intent not to perform under the contract when performance is due. *In re Marriage of Olsen*, 528 N.E.2d 684, 686 (Ill. 1988); *Draper v. Frontier Ins. Co.*, 638 N.E.2d 1176, 1181 (Ill. App. 1994). The repudiation has to "render unattainable" the point of the contract. *Olsen*, 528 N.E.2d at 686. When one party has committed a repudiation, the other party can treat the contract as ended. *Timmerman v. Grain Exch., L.L.C.*, 915 N.E.2d 113, 124 (Ill. App. 2009); *Truman L. Flatt & Sons Co., Inc. v. Schupf*, 649 N.E.2d 990, 994 (Ill. App. 1995). Whether an anticipatory repudiation has occurred is a question of fact. *Id.* As such, looming large in our determination are the factual findings and credibility determinations made by the bankruptcy court, findings that we review for clear error.[5] *Freeland*, 540 F.3d at 729. The bankruptcy judge concluded that LF's statements did amount to a repudiation, a finding that is more than plausible in light of the record here, and one we agree with. We believe the meaning of the September 29 and October 4 statements was clear: LF was not going to perform any more of its lending obligations under the Interim

---

[5] The trial on LF's motion involved five witnesses, three days of testimony, and over 100 exhibits, and generated 700 pages of trial transcript as well as 900 pages of deposition transcripts that the parties stipulated into evidence.

Order, and if Arlington wanted additional funds, it was going to have to look elsewhere. By stating that no further lending was forthcoming, LF had rendered the point of the parties' agreement unattainable.[6]

LF argues that its statements were only referring to a lack of interest in making *additional* lending agreements with Arlington, not regarding intentions of honoring the agreement they already had. The bankruptcy court found testimony from LF's general counsel to this effect not to be credible, and that the evidence as a whole instead "plainly showed LF's desire to exit the Arlington scene entirely." We reached the same conclusion after our review of the record. LF was not talking about some hypothetical future lending when making these statements. It was talking about whether it would perform any more lending under *this* DIP loan, and making clear it would not. The undisputed evidence was that Marks said LF did not want to lend any more money under "the DIP," and the bankruptcy court, looking at the way the parties used that terminology, concluded that he was clearly talking about LF's present funding obligations. And LF's October 4 email further

---

[6] The background against which the statements was made supports this conclusion. LF had only agreed to be a post-petition lender for Arlington because it wanted to preserve its ability to bid for Arlington's assets in the bankruptcy sale. But by late September, LF had decided it was not going to be a buyer and was increasingly uncomfortable with its corresponding position as a DIP lender. As the bankruptcy court concluded, "LF had had enough of Arlington. It wanted out."

supports this conclusion—referring to "the DIP loan" and that Arlington should find a "new DIP lender" to pay out "our loan." To be a repudiation, a statement need only be "sufficiently positive to be reasonably understood as meaning the breach will actually occur." *C.L. Maddox, Inc. v. Coalfield Servs., Inc.*, 51 F.3d 76, 81 (7th Cir. 1995) (quoting 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.21, p. 475 (1990)). LF's statements were more than sufficiently positive. Any reasonable person on the receiving end of LF's September 29 and October 4 statements would take them to mean that LF did not intend to make any more DIP loans to Arlington.

LF correctly points out that the September 29 and October 4 statements were not made directly to Arlington, but to its investment banker and Creditor Committee, respectively—both technically third parties. But Arlington's investment banker was acting as an agent, and statements to an agent within the scope of the agent's authority can qualify as statements to the principal. *See, e.g., N. Assur. Co. of Am. v. Summers*, 17 F.3d 956, 964 (7th Cir. 1994). And the Creditor Committee was obviously no stranger to the situation, and it is unrealistic for LF to argue that a statement to it would have no effect on the parties' agreement. *Cf.* 2 E. Allan Farnsworth, Contracts § 8.21 p. 561 (3d ed. 2004) (statement cannot be made to a "mere stranger"). As the bankruptcy judge correctly observed, LF had to know that comments to the Creditor Committee would make their way to Arlington. And in any event, we conclude as the bankruptcy court did that the repudiation took place on September 29, as Marks's statement alone clearly manifested LF's intent not to perform. The October 4

email merely corroborates the September 29 statement and makes it even more clear that LF was walking away from the lending agreement.[7]

### B.  LF Did Not Retract the Repudiation

LF contends that even if it did commit an anticipatory breach of the lending agreement, the breach was retracted when LF sent a Statement of Account to Arlington on October 6. LF argues that because the Statement of Account included a line stating that there was still $2.5 million available on the loan, LF was expressing a continued willingness to lend, retracting any statement to the contrary. We disagree that this constituted a retraction.

---

[7] LF also points to an October 3, 2005 email in which an LF lawyer refers to a conversation with Creditor Committee counsel as additional evidence that LF did not repudiate. In that email, LF's counsel states that he told the Creditor Committee that LF did not "expect to resolve our problems for a final DIP order." LF claims this shows it only intended not to proceed with a *final* financing agreement, not with any lending obligations that already existed. We have reviewed that email and do not believe that it alters the conclusion. The fact that LF was having issues with reaching a final DIP order does not undercut the repudiatory statements on September 29 nor its later statement on October 4; to the contrary, LF's reluctance with regard to a final order is to us entirely consistent with its position that it did not want to lend any further. We also note that in pointing to this email, LF apparently suddenly appears to subscribe to the position that communications to the Creditor Committee *do* carry weight.

A repudiation can be retracted, but for the retraction to be effective, it has to be a sufficiently clear statement. *See Kinesoft Dev. Corp. v. Softbank Holdings, Inc.*, 139 F. Supp. 2d 869, 901 (N.D. Ill. 2001); *see also Gilmore v. Duderstadt*, 961 P.2d 175, 181 (N.M. Ct. App. 1998) ("a retraction, to be effective, must be clear and unequivocal"); *Vahabzadeh v. Mooney*, 399 S.E.2d 803, 805 (Va. 1991); Farnsworth, *supra,* § 8.21. We do not believe that any language in the Statement of Account can be fairly characterized as a retraction in the context of LF's unequivocal statements from only days earlier stating an unwillingness to lend.

The statement to which LF points is a single line on a one-page form, and viewing it in context makes clear to us that it does not constitute a valid retraction. The record indicates that it was sent to Arlington by an LF analyst after Arlington's CFO requested it on September 27, 2005, along with a cover email stating, "[p]lease submit payment." The majority of the single-page Statement of Account is, consistent with the document's title, a chart setting out the various fees Arlington owed to LF, added up at the bottom on a line titled "Total Amount Due." In addition, the bottom left of the document includes a much smaller box entitled "Account Summary." Within this box is a series of lines indicating the status of the Revolver loan, with the final line stating "Loan Commitment Available: $2,483,490.17." This single line is not a sufficiently clear statement to retract LF's unequivocal repudiation. Moreover, the Statement of Account was not even sent by LF on its own initiative—it was sent in response to a request that Arlington's

CFO had made on September 27, two days *before* LF repudiated the agreement. It is not as if LF sent this document in a conscious effort to retract any breach, intending the "Loan Commitment Available" line to somehow undo the effect of its prior statements. The document had already been requested before Marks said anything on September 29. The fact that the State-ment of Account was sent only in reaction to Arlington having asked for it further undercuts the argument that it constituted a clear, unequivocal retraction. *See Vahabzadeh*, 399 S.E.2d at 805 ("[L]ogic and reason compel the application of the same standard to the retraction of a repudiation that is applied in determining whether a contract has been repudiated.").[8]

## C. Arlington Was Free From its Obligations Once LF Repudiated

LF argues that Arlington cannot assert an anticipatory repudiation because it incurred no detriment nor changed its position as a result of any breach. It is true

---

[8] LF also points to the fact that in October, the parties agreed to continue the bankruptcy court hearing on final approval of an order regarding the parties' financing agreement. LF contends that this was a retraction, because they effectively represent agreements to extend the interim order. We disagree. The routine continuation of a court hearing says nothing regarding LF's intentions to honor its financing obligations, certainly not in any way that would be sufficiently clear and unequivocal so as to constitute a retraction.

that Arlington never requested more funding after its initial Revolver draw, nor did it immediately notify LF that it treated the September 29 statement as a breach. But LF's repudiation immediately discharged all of Arlington's remaining duties under the lending agreement. *See Timmerman*, 915 N.E.2d at 124; Restatement (Second) of Contracts § 253. At the moment LF repudiated, Arlington was entitled to treat the agreement as having ended and was no longer under any obligation to perform. *Builder's Concrete Co. of Morton v. Fred Faubel & Sons*, 373 N.E.2d 863, 867-68 (Ill. App. 1978); *In re C&S Grain Co., Inc.*, 47 F.3d 233, 237 (7th Cir. 1995); *see also Timmerman*, 915 N.E.2d at 124 (repudiation effective "at the moment" defendant rendered performance impossible). LF clearly stated it would lend no more money and thus breached, and Arlington was entitled to treat it as such and walk away.

LF argues that it is significant that Arlington never sought rescission or brought suit against LF for any alleged breach. But it did not need to. "Unless the non-repudiating party wishes to hold the repudiator responsible for contract damages, the non-repudiating party need not make efforts to keep the contract in force." *In re C&S Grain Co.*, 47 F.3d at 237. It is *LF* seeking additional money in this case, not Arlington. Arlington—which paid LF in full for the money it borrowed—simply believes it has no further obligations under the agreement. Once LF declared it was unwilling to perform its obligations memorialized in the Interim Order, LF "was quite clearly not entitled to payments it would otherwise have been due." *SMS Demag Aktiengesellschaft v. Material*

*Scis. Corp.*, 565 F.3d 365, 370 (7th Cir. 2009). LF's theory that Arlington needs to have done more than it did in reaction to the breach "would allow a party to announce repudiation of its contractual duty and then be held blameless unless the other party objected and attempted to change [the] repudiating party's mind. Such is not the law." *Builder's Concrete*, 373 N.E.2d at 868. And the record shows that LF's repudiation *did* adversely affect Arlington. There was evidence before the bankruptcy court that upon learning that no more funds would be available under the DIP facility, Arlington felt increased pressure to rapidly negotiate an asset purchase, and was more constrained in its ability to explore other strategic options for the company.[9] We can, of course, never know what parallel universe might have unfolded if Arlington *did* have access to additional DIP lending, but that does not mean LF did not breach. Simply put, once LF walked away from its obligations on September 29, Arlington no longer had what it had bargained for: the availability of financing during the Chapter 11 bankruptcy process.

### D.  The Bankruptcy Judge Complied with Bankruptcy Rule 7052

Finally, LF advances a general argument that the bankruptcy court failed to comply with Federal Rules of Bank-

---

[9]  Counsel for Arlington stated at oral argument that Arlington had to "scramble" in reaction to the news.

ruptcy Procedure 7052 in its opinion. This argument fails. Rule 7052, which makes Fed. R. Civ. P. 52(a) applicable to adversarial bankruptcy proceedings, requires a bankruptcy court to "make findings that supply a clear understanding of the grounds underlying the court's decision." *Freeland*, 540 F.3d at 732. The bankruptcy judge did so here. The bankruptcy court supplied more than adequate findings supporting the conclusions it reached, and LF's arguments, and the evidence it submitted in support thereof, were adequately considered. The bankruptcy judge was not required to discuss every single piece of evidence before him—which would have been a virtually impossible task given how extensive the record was in this case. *See Mozze v. Jeffboat, Inc.*, 746 F.2d 365, 370 (7th Cir. 1984). To the extent LF disagrees with the findings that the bankruptcy judge made—particularly, the judge's finding regarding the September 29 statement—such findings would only be set aside if clearly erroneous. They are not. LF's Rule 7052 argument essentially asks us to assign importance to varying pieces of evidence in the record in a manner differently than the bankruptcy court did, but we do not reverse a bankruptcy court's factual findings "even if we would have weighed the evidence differently." *In re Lifschultz Fast Freight*, 132 F.3d 339, 343 (7th Cir. 1997). At most, LF has presented an alternative characterization of what transpired in September and October of 2005. But "where two permissible conclusions can be drawn, the factfinder's choice cannot be clearly erroneous." *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989). The bankruptcy court's conclusions were more than plausible in light of the record. *Freeland*, 540 F.3d at 729.

### III. CONCLUSION

The finding that LF committed an anticipatory repudiation of the parties' lending agreement was not clearly erroneous. While Arlington did fail to pay fees that were due immediately per the parties' agreement, by the time LF properly informed Arlington of the potential breach by using the notice procedures in the Interim Order, LF had already breached the agreement. Having walked away from the agreement before Arlington's breach ever became effective, LF cannot now invoke the Interim Order to obtain the additional fees and interests it seeks. The ruling below is AFFIRMED.