In re TEXAS HEALTH
ENTERPRISES,
INC.

HEA Management Group, Inc.,

Health Enterprises of Michigan,
Inc. and Health Enterprises of
Oklahoma, Inc., Debtors.

Nos. 99–42469 to 99–42472.

United States Bankruptcy Court,
E.D. Texas,
Sherman Division.

Jan. 27, 2000.

Mark E. MacDonald, MacDonald & Schuble, L.L.P., Dallas, TX, for debtors.

James Montgomery, Soules & Wallace, San Antonio, TX, for Lytle Nursing Home, Inc. and James Cotter.

Mike Sutherland, McConnell & Goodrich, Fort Worth, TX, for the Official Committee of Unsecured Creditors.

## *OPINION*

DONALD R. SHARP, Chief Judge.

Now before the Court for consideration is the Motion to Assume Real Estate Leases at Turner Nursing Home, Hillside Manor Nursing Center and Lytle Nursing Home Pursuant to Section 365 and Bankruptcy Rule 6006 (the "Motion") filed by Texas Health Enterprises, Inc., a Debtor in these jointly administered bankruptcy cases (the "Debtor") and the responses to same filed by Lytle Nursing Home, Inc., and James F. Cotter, its President. The Court has reviewed the Motion and responses thereto and has considered all testimony presented and evidence admitted at the hearing together with the record in these cases. The Court considered the pleadings filed and the evidence adduced in support of the Motion. This opinion constitutes the Court's findings of fact and conclusions of law to the extent required by Fed.R.Bankr.Proc. 7052 and disposes of all issues before the Court.

## FACTUAL AND PROCEDURAL HISTORY

Texas Health Enterprises, Inc., HEA Management Group, Inc., Health Enterprises of Michigan, Inc., and Health Enterprises of Oklahoma, Inc. (the "Debtors") filed their voluntary petitions under Chapter 11 of Title 11 of the U.S.Code on August 3, 1999. Since the petition date, Debtors have managed their property and operated their business as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. The debtor corporations are all related corporations controlled by Peter Kern and they moved for joint administration of the bankruptcy cases. Following a hearing, this Court entered an order allowing joint administration of these affiliated debtors. No disclosure statement or plan of reorganization has been filed as of January 4, 2000, the date of this hearing. Texas Health Enterprises, Inc. is the second largest nursing home operator in the State of Texas and currently operates 78 homes in the state. Health Enterprises of Michigan, Inc. operates eight nursing homes in the State of Michigan. Health Enterprises of Oklahoma, Inc. was a sub-lessee in the State of Oklahoma. Debtors allege that this case was precipitated by certain changes in the Federal laws affecting the procedures pursuant to which Medicare and Medicaid reimburse health care providers of the Debtors' type.

Texas Health Enterprises, Inc. ("THE") filed the Motion to Assume Real Estate Leases at Turner Nursing Home, Hillside Manor Nursing Center and Lytle Nursing Home Pursuant to Section 365 and Bankruptcy Rule 6006 before this Court (the "Motion"). Turner Nursing Home and Hillside Manor Nursing Center, although named in the Motion, are not the subject of this opinion. Lytle Nursing Home, Inc. and its president, James F. Cotter (referred to hereinafter jointly as "Lytle") were the sole parties who objected to THE's Motion and the matter came on for hearing solely as it pertained to Lytle Nursing Home, Inc. Following the hearing the Motion was taken under advisement to allow this Court to review the documents giving rise to the controversy between the parties. In particular, this Court has reviewed the Sublease of Lytle Nursing Home entered into by and between Lytle Nursing Home, Inc., and THE, dated March 28, 1988 (Plaintiff's Exhibit # 1), the Management Contract for Lytle Nurs-

**834**

ing Home by and between Lytle Nursing Home, Inc. and THE (Plaintiff's Exhibit # 2; Defendant's Exhibit "B"), and correspondence dated May 19, 1988 from Lytle's general counsel to the Texas Department of Health (Plaintiff's Exhibit # 3).

Lytle objects to THE's assumption under § 365 on the basis that there is no valid lease between Lytle and THE. At the hearing, the parties inadequately addressed the documents, the contractual foundation underlying their business relationship. For example, the Sublease admitted into evidence at the hearing is subject to a Master Lease that was not offered to the Court by either party[1]. Nor was its absence explained. Hence, proper legal characterization of the documents and contractual business relationship between the parties is an issue the resolution of which must be reserved by this Court. Regardless of the proper legal characterization and validity of the documents pursuant to which the parties did business, it is clear to this Court that pre-petition the parties were in fact operating under some sort of agreement with mutual consent. With respect to the proper legal characterization of the documents, significant portions of the hearing were devoted to whether the contract sought to be assumed is assignable and whether it is a personal services contract. The Court concludes that the Sub-lease and the Management Contract, regardless of their nomenclature, do represent the parties' agreement and should be considered as a whole rather than taken up separately as was suggested at the hearing. To do so is in the interest of judicial economy and conforms with the tenets of contract interpretation.[2]

## DISCUSSION

The true issue before this Court is whether THE has complied with the applicable provisions of the Bankruptcy Code to entitle it to be allowed to assume a profitable lease and/or management contract over the objections of Lytle, its creditor. 11 U.S.C. § 365(a) provides (in pertinent part) that subject to the court's approval a trustee, or where applicable, a debtor-in-possession, may assume or reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). However, under 11 U.S.C. § 365(b)(1):

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee [or the debtor-in possession]—(A) cures, or provides adequate assurance that the trustee will promptly cure, such default; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

This decision turns on 11 U.S.C. § 365(b)(1)(C), particularly whether the Debtor is able to or has provided adequate assurance of its future performance under the agreement to Lytle. Adequate assurance of future performance "is to be given a practical, pragmatic construction based upon ... the circumstances of [the] case". *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bkrtcy.S.D.Fla.1994) quoting *In*

---

1. The Motion indicated that it was a motion seeking to assume a lease of property. Respondent argued that there was no lease of property but that, in fact, Debtor was operating the nursing home under a management agreement. The sublease at issue did not appear to be properly executed and it was unclear from the evidence whether it ever constituted a contract between the parties.

2. For the theory pursuant to which a bundle of documents should be read together, *see Pendleton Green Associates v. Anchor Savings Bank*, 520 S.W.2d 579 (Tex.Civ.App.,—Corpus Christi, 1975 no writ).

*re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bkrtcy.D.N.J.1988). "Assurance of future performance is adequate 'if performance is likely (i.e. more probable than not)' and the degree of assurance necessary to be deemed adequate 'falls considerably short of an absolute guaranty.'" *In re PRK Enterprises, Inc.*, 235 B.R. 597, 603 (Bkrtcy. S.D.Tex.1999). The burden is on the movant.

 The phrase "adequate assurance" as it is used in § 365 may be traced to the phrase "adequate assurance" defined in § 2–609(1) of the Uniform Commercial Code:

The terms **"adequate assurance of future performance"** are not words of art; the legislative history of the Code shows that they were intended to be given a practical, pragmatic construction.

The phrase first appears in the legislation proposed by the Commission on Bankruptcy Laws....

The Commission Report explains the language **"adequate assurance of future performance"** as follows:

"The language 'is adopted from Uniform Commercial Code § 2–609(1).' What constitutes 'reasonable time thereafter' for curing defaults or an 'adequate assurance of future performance' must be determined by consideration of the facts of the proposed assumption. Cf. Official Comment 4 to Uniform Commercial Code § 2–609 (1972 Edition). It is not intended, however, that any non-debtor party should acquire greater rights in a case under the act than he has outside the act." Report of the Commission on Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, 93d Cong., 1st Sess. Pt. II 156–57 (1973). Section 2–609 of the Uniform Commercial Code, from which the bankruptcy statute borrows its critical language, provides that "when reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of future performance...." The Commentaries to the Code note that "'adequate' assur-

ance is to be 'defined by commercial rather than legal standards.'" Official Comment 3 To Uniform Commercial Code § 2–609 (1972 Ed.). What constitutes "adequate assurance" is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary or capricious.

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310–11 (5th Cir.1985) citing to *In re Sapolin Paints, Inc.*, 5 B.R. 412, 420–21 (Bankr.E.D.N.Y.1980). Not only must the [debtor-in-possession] provide adequate assurance of promptly curing any defaults existing under the lease, compensate or provide adequate assurance of promptly compensating the actual pecuniary losses suffered by reason of such defaults, and provide adequate assurance of future performance under such lease, [it] must also "assume" or agree to live in accordance with the remaining provisions in the lease. *In re Pin Oaks Apartments*, 7 B.R. 364, 367 (Bkrtcy.S.D.Tex.1980). This Court concludes that "remaining provisions of the lease" includes non-monetary as well as monetary provisions of the lease. The United States Supreme Court in *Hurley v. Atcheson, Topeka & Santa Fe Ry.*, 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 (1909) recognized that a trustee can only assume an executory contract by accepting the burdens of that contract as well as its benefits. *In re Pin Oaks Apartments, Ibid.* at 369.

 The evidence before this Court consists of the documents listed hereinabove, Lytle's License and Application for License and the testimony of witnesses for both parties including Richard Knight, THE's president and COO, James F. Cotter, Lytle's president, and William Sleeth, Lytle's Comptroller. The testimony presented to this Court was both convincing and credible that Lytle has no assurance that it would be paid going forward or that THE would perform its non-monetary

duties and obligations under its agreement with Lytle.

Lytle provided evidence to the Court of two monetary defaults either of which would be sufficient to support Lytle's position and prohibit assumption of the contract. THE's witness' testimony regarding current and future availability of funds, although neither supported nor rebutted by financial analysis of either party, nonetheless appeared dubious given the persuasive testimony respecting THE's pre-petition and post-petition inability to pay its fees as they became due to Lytle within the 30 day period provided for under the terms of the Management Contract. In addition, James F. Cotter ("Cotter") averred that real property and personal property taxes post-petition have not been paid as required under the Sub–Lease. THE refuted the allegations saying that the taxes were not yet due. No documentary proof was provided to the Court by either party. Contradictory testimony regarding defaults in payment of taxes must be weighed against the party bearing the burden. However, given THE's offer to cure the monetary default, the Court also considered the non-monetary aspects of the Management Contract and Sub–Lease sought to be assumed by THE and evidence of THE's ability to fully perform under same.

■ James Cotter's and William Sleeth's testimony revealed a relationship riddled with problems of either extremely poor communication between the parties or, simply, blatant disregard by THE of its duties under the Management Contract. Cotter testified to incidents in which THE failed to respond to Lytle's inquiries, requests for reporting and other instructions involving. management directly effecting nursing home residents' welfare. Such testimony was not refuted by THE. Examination of the witnesses of both parties provided significant, credible evidence of Medicare and Medicaid regulation violations and licensing irregularities with which THE's chief witness "would not argue". Also, Lytle complained that THE failed to respond to instructions regarding a transfer of THE's obligations and rights to perform under a similar management contract between the parties. Although other contracts are not before this Court, the testimony exemplified the course of dealing between the parties. The historical relationship between THE and Lytle impacts on assurance of future performance.

More important to this Court, the negative effects of the poor relationship between the parties must affect the welfare of the nursing-home residents to some degree. Another example of the contentious relationship between Lytle and THE was unrebutted testimony indicating that THE made certain physical changes to two of Lytles' nursing home facilities under its control. Lytle's witnesses testified that Lytle had directly instructed THE not to do so. Further, examination of the witnesses revealed that THE never corrected the problem or offered to cure. Testimony indicated that THE failed to comply with notice provisions in the Management Contract (*Management Contract Section 21, page 16*) as well as with requirements for reporting to Lytle under its provisions, inter alia, in connection with personal injury suits against THE and Lytle as co-defendants. However, it weighs in THE's favor on this point that it is not clear to the Court whether notice was properly given to THE of its non-monetary defaults or whether notice was stayed by the filing of the petition.

## CONCLUSION

Although at the hearing THE offered to cure any monetary default, no offer to cure the non-monetary defaults was extended. Convincing testimony revealed unrefuted examples of THE's bad faith in carrying out its duties to Lytle regardless of the characterization of the legal documents creating the relationship as either lease or management contract. There was ample evidence of non-performance of duties pre- and post-petition. It is clear to this Court

that under non-bankruptcy law, Lytle would have substantial grounds for terminating its relationship with THE. Therefore, this Court must find that THE has not offered Lytle adequate assurance of its future performance under the Sublease or the Management Contract. The foregoing findings and conclusions moot the issues of assignment/non-assignability and whether the Management Contract is a personal services contract. For the reasons set forth hereinabove, based upon the facts and a standard of what is commercially reasonable, this Court is of the opinion that the evidence does not support a finding that adequate assurance of future performance as contemplated under 11 U.S.C. § 365(b)(C) has been provided to the objecting parties. An order will be entered accordingly.