# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-4118

IN RE:

RESOURCE TECHNOLOGY CORPORATION,

*Debtor.*

APPEAL OF:

ILLINOIS INVESTMENT TRUST NO. 92-7163,

*Appellant,*

*v.*

ALLIED WASTE INDUSTRIES, INC.,
AMERICAN DISPOSAL SERVICES OF ILLINOIS, INC.,
SANGAMON VALLEY LANDFILL, INC.,
CITY OF PEORIA, ILLINOIS, and
COUNTY OF PEORIA, ILLINOIS,

*Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cv-02425—**Matthew F. Kennelly**, *Judge.*

No. 08-4310

IN RE:

RESOURCE TECHNOLOGY CORPORATION,

*Debtor.*

APPEAL OF:

CHIPLEASE, INCORPORATED,

*Appellant*,

v.

JAY A. STEINBERG, Chapter 7 Trustee
for Resource Technology Corporation,

*Appellee*.

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cv-04040—**Matthew F. Kennelly**, *Judge*.

---

ARGUED MAY 29, 2009—DECIDED OCTOBER 1, 2010

---

Before RIPPLE, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. These appeals challenge several rulings of the bankruptcy court in lengthy Chapter 7 proceedings involving Resource Technology Corporation ("RTC"). Prior to its involuntary placement in bankruptcy, RTC was in the business of developing gas-to-energy conversion systems at solid-waste landfills. Other aspects of this bankruptcy have been addressed in several earlier appeals. *See Ill. Inv. Trust No. 92-7163 v. Am. Grading Co.*, 562 F.3d 824 (7th Cir. 2009); *In re Res. Tech. Corp.*, 528 F.3d 467 (7th Cir. 2008); *In re Res. Tech. Corp.*, 430 F.3d 884 (7th Cir. 2005). We have consolidated these two cases for decision because they are procedurally interrelated and share a common factual background.

Section 365 of the Bankruptcy Code allows a bankruptcy trustee to assume certain executory contracts of the debtor and assign them to a third party as long as the bankruptcy court has received "adequate assurance of future performance." 11 U.S.C. § 365(a), (f)(2)(B). RTC had contracts with four Illinois landfills for the exclusive right to develop gas-to-energy conversion projects at the landfill sites. During the course of the bankruptcy, RTC's key officers assumed managerial positions in two companies—Chiplease, Inc. and Scattered Corp.—and then had these companies designated as beneficiaries of a long-dormant investment trust known as Illinois Investment Trust No. 92-7163 ("the Investment Trust" or "the Trust"). The idea was to have the trustee assume and assign RTC's gas-conversion contracts to the Trust.

The plan ran into trouble, however, when the bankruptcy trustee applied to the court for permission to assume and assign the contracts, as § 365(f)(2)(B) requires. The owners of the four landfills objected; they did not believe the Investment Trust could demonstrate adequate assurance of future performance because it had not explained how it would obtain the $3 million necessary to perform RTC's obligations under the contracts. The bankruptcy court agreed with the landfill owners and rejected the proposed assignments. The district court affirmed, and the Investment Trust appealed to this court.

The second case is an appeal by Chiplease, and it challenges several orders made in connection with a court-approved settlement requiring Chiplease to pay RTC's

Chapter 7 operating expenses in exchange for the assignment of certain RTC contracts. While the dispute involving the Trust was working its way through the lower courts, a group of administrative claimants challenged Chiplease's failure to comply with a court order requiring it to deposit $500,000 in an escrow account as security for RTC's ongoing operating expenses. Chiplease claimed it was excused from the escrow-deposit requirement because it had independently paid about $1 million in RTC's operating expenses. The bankruptcy court disagreed and ordered Chiplease to make the deposit. Chiplease appealed to the district court, which affirmed and also found Chiplease in contempt for failing to comply with the order. Chiplease appealed.

We affirm in both cases. The bankruptcy court carefully evaluated the assumption-and-assignment proposal under § 365(f)(2)(B), and its decision to deny the trustee's motion was sound. We likewise see no reason to disturb the bankruptcy judge's determination that Chiplease failed to comply with the court order requiring an escrow deposit. Finally, the district court's contempt finding is fully supported by the record; the court thoroughly considered and properly rejected Chiplease's defense to contempt.

## I. Background

In the 1990s RTC was in the business of collecting gas emitted from garbage landfills and either selling it or converting it into electricity. RTC had contracts with the owners of several Illinois landfills that gave it the

exclusive right to develop and install gas-to-energy conversion projects at the landfills. Four of these agreements are at issue in this appeal. RTC never collected enough revenue from its gas-to-energy operations to offset the expense of capturing the gas, and by 1999 the company became the subject of an involuntary Chapter 7 petition. For a time during the course of the lengthy bankruptcy proceedings, RTC's case proceeded under Chapter 11 as a reorganization, but as the prospects for RTC's recovery grew increasingly dim, the bankruptcy court converted the case back into a Chapter 7 proceeding.

The bankruptcy trustee eventually entered into a settlement agreement with some of RTC's creditors, including Chiplease and Scattered, the two companies whose principals are former owners and directors of RTC. (Leon Greenblatt and Andrew Jahelka owned RTC; Greenblatt owned Chiplease, and Greenblatt and Jahelka together owned Scattered.) As part of this agreement, the trustee was to assume some of RTC's landfill contracts and assign them to Chiplease and Scattered, and Chiplease was to pay RTC's operating expenses while RTC remained in bankruptcy. The agreement also required Chiplease to establish a $500,000 escrow as security for these expenses. The bankruptcy court approved the settlement agreement.

## A.  The Investment Trust's Appeal

Pursuant to § 365(f)(2)(B), the bankruptcy trustee asked the court for permission to assume four RTC landfill gas-conversion agreements and assign them to

Chiplease and Scattered, which would then reassign to
the Investment Trust. The Trust had been organized
under Illinois law in 1992 to engage in dividend rein-
vestment plans but remained dormant for more than a
decade and did not engage in any business operations.
While the RTC bankruptcy was ongoing, however, Scat-
tered and Chiplease had been made the beneficiaries of
the Trust, and intended to use it to receive certain
RTC assets and re-enter the gas-to-energy business. With
this in mind, John Connolly, RTC's president, was ap-
pointed as the trustee of the Investment Trust.

At the time of the bankruptcy trustee's § 365(f)(2)(B)
motion, the City of Peoria and Allied Waste Industries
("Allied") owned the landfills that were the subject of the
underlying agreements. They objected to the proposed
assignment of their contracts to the Investment Trust;
they did not believe the Trust could demonstrate ade-
quate assurance of future performance as required by
§ 365(f)(2)(B). After lengthy discovery and a two-day
trial on the objections, the bankruptcy judge agreed with
Peoria and Allied and rejected the proposed assignments.
The parties had stipulated that it would cost about
$3 million to perform the obligations under the agree-
ments, and at the time of the trial, the Trust had less
than $1,000 cash on hand and no operating history.
Greenblatt and Jahelka testified that Chiplease and Scat-
tered would lend the required $3 million to the Trust, but
the judge was unconvinced. He concluded that the Trust
was not financially capable of performing under the
agreement, and Scattered and Chiplease had their own
financial problems. The judge also doubted that the

Trust had any effective way of requiring Scattered and Chiplease—who were the Trust's beneficiaries—to lend it the money it needed to perform the contracts.

Two weeks later Scattered and Chiplease moved the court to reconsider. The motion proposed assigning the same contracts to a new entity called Illinois Generating Station #1. The judge denied the motion for two reasons. First, interpreting the motion as an entirely new proposal, the court held that it was untimely. Alternatively, if the motion was properly interpreted as a motion to reconsider based on new evidence, the judge concluded that the "evidence" was not "newly discovered." The Investment Trust appealed to the district court, the district court affirmed, and the Trust appealed to this court.

## B. Chiplease's Appeal

As the proposal involving the Investment Trust moved from the bankruptcy court to the district court, two administrative claimants complained to the bankruptcy judge that Chiplease had not complied with its obligations under the settlement agreement to establish a $500,000 escrow as security for RTC's operating expenses. Paragraph 23 of the Settlement Order set forth Chiplease's obligations in detail:

> As more fully set forth in Paragraph 11 of the Settlement Agreement: (I) [Chiplease] shall deposit the sum of $500,000.00 to be held in escrow by its counsel . . . for the payment of all unpaid Chapter 7 oper-

ating expenses above $150,000.00 and any expenses incurred while the Estate continues to operate [RTC's] business . . . .

Paragraph 11 of the Settlement Agreement, in turn, stated:

Chiplease shall pay all unpaid Chapter 7 operating expenses above $150,000 and any expenses incurred while the Estate continues to operate [RTC's] business ("Expenses"). The Estate shall pay the first $150,000 of these expenses. On or before the Closing Date, Chiplease shall deliver to its counsel . . . the sum of $500,000.00 to be used to pay the Expenses ("Adequate Security").

Paragraph 11 also established a detailed procedure setting forth how Chiplease was required to pay RTC's operating expenses; it said expenses would be paid upon submission of an expense request by the bankruptcy trustee. When the settlement order was entered, the parties had estimated that the operating costs would be between $250,000 and $400,000. Chiplease claims that it directly paid more than $1 million in operating expenses between 2006 to 2008, but it is undisputed that it never complied with the express terms of Paragraph 23's payment provisions—most particularly, it did not comply with its obligation to deposit $500,000 into escrow and follow the payment procedures specifically established in the settlement agreement.

Accordingly, the administrative claimants asked the bankruptcy court to order Chiplease to post the security required by Paragraph 23 of the settlement order.

Chiplease objected, claiming that its failure to establish the $500,000 escrow account should be excused because it had already directly paid more than twice that amount in RTC's operating expenses. The bankruptcy trustee supported the administrative claimants' motion, arguing that the payment procedures prescribed by the agreement prohibited Chiplease from unilaterally deciding what expenses to pay. The trustee also argued that the escrow requirement was designed to ensure the existence of an adequate fund from which approved operating expenses could be paid. The bankruptcy court agreed with the trustee and ordered Chiplease to make the escrow deposit of $500,000, as required by the settlement order. Chiplease appealed to the district court and asked for a stay of the bankruptcy court's order. The district court denied the stay and on July 18, 2008, specifically ordered Chiplease to make the $500,000 escrow deposit. With an exception not relevant here, the district court later affirmed the bankruptcy court.[1]

Chiplease did not comply with the court's July 18 order, however, and on the trustee's motion, the district court initiated a civil contempt proceeding. Chiplease defended its failure to comply, claiming it was financially unable to establish the $500,000 escrow account. The district court rejected this argument, held Chiplease in

---

[1] The bankruptcy court had ordered Chiplease to pay approximately $47,000 in interest, but the district court reversed this portion of the bankruptcy judge's decision. Because the trustee has not challenged this aspect of the district court's order, we do not discuss it further.

contempt, and ordered it to pay a penalty of $5,000 per day until it complied with the escrow requirement. The court also ordered Chiplease to pay the bankruptcy trustee's attorney's fees associated with the contempt proceeding. A week later Chiplease asked the court to reconsider its decision, claiming "new evidence." The court denied this motion based on Chiplease's lack of diligence in gathering the new evidence and presenting it to the court.

## II.  Discussion

We review the bankruptcy court's conclusions of law de novo and its factual findings for clear error. *Freeland v. Enodis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008). "If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, we will not reverse its factual findings even if we would have weighed the evidence differently." *Id.* (citation and internal quotation marks omitted).

### A.  The Investment Trust's Appeal

#### 1.  *Allied's Standing to Challenge the Proposed Assignment*

The Trust begins with a curious argument about standing, claiming that Allied lacked standing to challenge the trustee's proposed assumption and assignment of the contracts at issue in this appeal. This argument makes little sense. Article III's standing requirements apply to proceedings in bankruptcy courts just as they

do to proceedings in district courts. *In re FedPak Sys., Inc.*, 80 F.3d 207, 213 (7th Cir. 1996). However, "[b]ankruptcy standing is narrower than Article III standing." *In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607 (7th Cir. 1998). Standing to object to a proposed bankruptcy order requires that the objector "have a pecuniary interest in the outcome of the bankruptcy proceedings." *Id.* Although Allied did not have any ownership interest in the landfills in the 1990s when the RTC gas-to-energy contracts were signed, by the time of the bankruptcy, it was the owner by succession and was identified by the trustee as RTC's contract partner in three of the agreements. (Peoria owns the landfill involved in the fourth.) Although the Investment Trust now contends that Allied did not prove in the bankruptcy court that it owns the landfills in question, everyone proceeded on that understanding, and the Trust *itself* referred to Allied as the owner in several of its bankruptcy-court filings. There is absolutely nothing in the record to suggest that Allied is *not* the owner of the landfills. Tellingly, although it had every incentive to do so, the Investment Trust has never identified who (if not Allied) actually *does* own the landfills and therefore is a party to the agreements sought to be assumed and assigned. Quite obviously, there would be no reason for Allied to object to the assignments if it had no ownership interest in the landfills. We reject the Investment Trust's challenge to Allied's standing.

## 2. *Adequate Assurance of Future Performance*

The Investment Trust argues that the bankruptcy court erred in rejecting its assumption-and-assignment proposal under § 365(f)(2)(B). As we have noted, § 365 of the Bankruptcy Code allows the bankruptcy trustee to assume and assign a contract of the debtor to another party, but only if "adequate assurance of future performance by the assignee of such contract . . . is provided." 11 U.S.C. § 365(f)(2)(B). "Adequate assurance of future performance" is interpreted by reference to section 2-609 of the Uniform Commercial Code. *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir. 1985); *see also* REPORT OF THE COMMISSION ON BANKRUPTCY LAWS OF THE UNITED STATES, H.R. Doc. No. 93-137, pt. 2, at 156-57 (1973) (observing that the phrase "adequate assurance of future performance" "is adopted from Uniform Commercial Code § 2-609(1)"). Several factors are relevant to the determination: the financial ability to perform the contract; the general economic climate; the existence of a guarantee; the reputation of the party seeking to assume responsibility for the contract; and past dealings between the parties. *See*, *e.g.*, *Richmond Leasing Co.*, 762 F.2d at 1310 (identifying the first three factors); U.C.C. § 2-609 cmt. 4 (discussing the last two factors). We review the bankruptcy court's determination for clear error. *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 439 (5th Cir. 2002).

The Investment Trust argues first that the bankruptcy court applied the incorrect legal standard by essentially

requiring an absolute *guarantee* of performance. *See In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (observing that "the required assurance will fall considerably short of an absolute guarantee of performance" (citation omitted)). As used in § 365(f)(2)(B), "adequate" is a term of art and simply means assurances that are commercially reasonable under the particular circumstances of the case. This is a commonsense, case-specific inquiry, and § 365(f)(2)(B) is given "a practical, pragmatic construction," *Richmond Leasing Co.*, 762 F.2d at 1309. Our review of the record convinces us that the bankruptcy court applied the correct standard.

The judge focused his inquiry on whether the Investment Trust could show "by a preponderance of the evidence that future performance is likely." Contrary to the Trust's argument, this statement does not suggest that the court required an absolute guarantee of performance. Instead, the court required the Trust to show it was more likely than not to perform the obligations of the contract. This is the standard commonly applied to evaluate the adequacy of the future-performance assurances for purposes of § 365(f)(2)(B). *See In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (citing cases and explaining that an adequate assurance means that performance should be "more probable than not"). As the party seeking to become the assignee, the Trust had the burden of proving it met the requirements of § 365(f). *See In re Tex. Health Enters., Inc.*, 246 B.R. 832, 835 (Bankr. E.D. Tex. 2000).

To understand the bankruptcy judge's decision, it is important to place the proposed assumption-and-assignment transaction in context. The Trust was created under Illinois law as an investment vehicle but was long dormant; Scattered and Chiplease were named as its beneficiaries while the RTC bankruptcy was ongoing and RTC's principals decided to use the Trust to hold and manage the four RTC contracts they wanted to assume. The parties agreed that it would take about $3 million to perform RTC's obligations under these contracts. Thus, the Investment Trust's ability to obtain $3 million in financing was, to use the bankruptcy judge's words, "absolutely essential" to the Trust's ability to perform; the Trust had no independent assets or revenue stream and was entirely dependent on other entities for capital. Although Scattered and Chiplease intended to loan the Investment Trust the $3 million it needed to perform the four landfill gas-collection agreements, the Trust had no enforceable right to demand this financing, as the bankruptcy judge noted. The judge was understandably skeptical that the Investment Trust would sue Scattered or Chiplease if they decided not to provide the funds. Indeed, Connolly acknowledged in his testimony that he would be unlikely to sue Scattered or Chiplease to obtain the promised financing; and even if he did, Scattered and Chiplease—in their role as beneficiaries of the Trust—could have him replaced as trustee.

The bankruptcy judge also doubted that Chiplease or Scattered had the financial wherewithal to lend the Investment Trust the $3 million everyone agreed was required to fulfill the obligations of the assigned con-

tracts. The Trust did not submit any financial statements at trial, and according to the witnesses' testimony, most of the assets of the two companies were illiquid. There is very little in the record explaining exactly how Chiplease and Scattered expected to come up with a $3 million capital infusion for the Investment Trust; indeed, the testimony established that Scattered did not have the funds necessary to contribute to this sum.[2] Finally, the bankruptcy court properly considered the fact that the Trust was controlled by the same managers who were at the helm of RTC when it was forced into bankruptcy. Given RTC's difficulties in performing its contracts before the involuntary Chapter 7 petition was filed, the bankruptcy court was within its discretion to require more convincing evidence of the Investment

---

[2] We also note the incongruity between the Investment Trust's reliance on Chiplease for financing and Chiplease's own argument in the consolidated appeal that as of June-July 2008, it lacked sufficient funds to comply with the district court's order to establish a $500,000 escrow as security for RTC's operating expenses. Indeed, in its opening brief on appeal, Chiplease argued that it should not be held responsible for its failure to comply with the district court's escrow order because of its "extremely weak financial condition" in 2008. Appellant's Br. at 9, *In re Res. Tech. Corp.*, No. 08-4310 (7th Cir. Mar. 9, 2009). In light of this argument—made by the same attorneys who represent the Trust in its appeal—we are surprised the Trust continues to insist that Chiplease stood ready and able to provide the $3 million in financing necessary for the Trust to be in a position to fulfill the obligations of the assumed-and-assigned contracts.

Trust's ability to perform. *See* U.C.C. § 2-609 cmt. 4 (noting that a promise of performance alone might be "adequate" when it is made by "a seller of good repute" but not when it is made by "a known corner-cutter").

The Trust claims that the bankruptcy judge improperly demanded an escrow account as a condition for approving the assignment. The record does not support this assertion. When the judge announced his decision, he suggested that he would have approved the proposed assignment if the Investment Trust could have shown it had the necessary $3 million in an escrow account. This comment is no more than an observation that the absence of such a fund further undermined the Trust's effort to carry its burden of establishing adequate assurance of performance. Under the fact-intensive, commercial-reasonableness inquiry contemplated by § 365(f)(2)(B), the judge's observation was entirely appropriate.

As a final matter, the Trust claims the bankruptcy court gave insufficient weight to the testimony of Connolly (president of RTC and the trustee of the Investment Trust), Greenblatt (owner and director of both Scattered and Chiplease), and Jahelka (co-owner and director of Scattered). These witnesses testified about the financial health of the Investment Trust, Chiplease, and Scattered, and explained that Scattered and Chiplease intended to loan $3 million to the Trust. But the cross-examination of these witnesses identified many weaknesses in their testimony, and it was the Trust's burden to introduce enough evidence to demonstrate adequate

assurance of future performance. *See Texas Health Enters.*, 246 B.R. at 835. The bankruptcy judge was well within his discretion to conclude that the testimony of the Trust's witnesses was insufficient to meets its burden of proof under § 365(f)(2)(B). *See United States v. Irby*, 558 F.3d 651, 654 n.3 (7th Cir. 2009).

In sum, the bankruptcy court weighed all the evidence and made a reasoned, well-supported decision that the Investment Trust had failed to provide adequate assurance of future performance under § 365(f)(2)(B). We have considered the Trust's other arguments and find them without merit. Accordingly, we reject the Investment Trust's challenge to the bankruptcy court's order declining to approve the assignment of the four Allied and Peoria landfill contracts to the Trust.

### 3. The Bankruptcy Court's Refusal to Reconsider its Decision

The Investment Trust also challenges the bankruptcy court's refusal to reconsider its decision rejecting the assignments. Our review is for an abuse of discretion, *Greene v. Potter*, 557 F.3d 765, 767 (7th Cir. 2009), and under the circumstances here, the Trust's argument requires only brief comment. It is somewhat unclear whether the bankruptcy judge treated this motion as a request to revisit its decision and entertain newly discovered evidence under Rule 59 of the Federal Rules of Civil Procedure or as an entirely new assumption-and-assignment proposal. If the former, the evidence was not "newly discovered" within the contemplation of a proper Rule 59(e) motion, and the request was properly

denied on this basis. *See, e.g., Envtl. Barrier Co. v. Slurry Sys., Inc.*, 540 F.3d 598, 609 (7th Cir. 2008). If the latter, the motion was properly denied as untimely; it was filed more than a year-and-a-half after the deadline set by the bankruptcy judge, and under 11 U.S.C. § 365(d)(1), the judge was entitled to reject it on timeliness grounds.

## B.  Chiplease's Appeal

### 1.  The Bankruptcy Court's Escrow Order

Chiplease challenges the bankruptcy court's order requiring it to deposit $500,000 in escrow for RTC's operating expenses as contemplated by the settlement agreement that had been approved by the court. Chiplease admits it never deposited the money in accordance with the terms of the settlement agreement and the court's order, but it defends its failure to do so on the ground that it had already directly paid more than $1 million of RTC's operating expenses. Essentially, Chiplease maintains it complied with the spirit but not the letter of the order. "[A] court that has issued an order is in the best position to interpret it." *Ill. Inv. Trust No. 92-7163 v. Am. Grading Co.*, 562 F.3d 824, 830 (7th Cir. 2009). We owe substantial deference to the bankruptcy court's interpretation of its own orders and will not overturn that interpretation unless we are convinced that it amounts to an abuse of discretion. *See In re Airadigm Commc'ns, Inc.*, 547 F.3d 763, 768 (7th Cir. 2008).

Chiplease's lone argument is that it effectively complied with its obligations under the order by directly

paying more than $1 million of RTC's operating expenses. The trustee notes, however, that the agreement and order called for the establishment of the $500,000 escrow account as security for payment and set up a specific procedure for payment of *approved* operating expenses. The trustee argues that much of the $1 million Chiplease paid was for unapproved expenses.[3]

The bankruptcy judge held that the order was clear and that Chiplease's direct payment of RTC's operating expenses did not satisfy its obligation to establish the $500,000 escrow account. This was not an abuse of discretion. Chiplease was ordered to deposit $500,000 into an account that would serve both as a source of funds for approved expenses and as a security deposit in the event Chiplease could not fulfill its obligations to pay RTC's operating expenses under the settlement agreement. Chiplease's failure to comply is not excused by its direct payment of unapproved operating expenses.

Chiplease argues that because the trustee knew it was paying RTC's Chapter 7 operating expenses—albeit not in accordance with the agreement and order—it was relieved of its obligation to establish the escrow account. We disagree. The noncompliance motion was filed by administrative claimants who were concerned that

---

[3] Under the agreement the Chapter 7 trustee was to submit an expense request to Chiplease, which then had seven days to either pay the expense or to dispute the request in writing. If Chiplease disputed the expense, the trustee had ten days to file a motion with the bankruptcy court to determine whether Chiplease should pay the expense.

Chiplease lacked sufficient funds to cover continuing operating expenses. *See* FED. R. BANKR. P. 9019 (permitting administrative claimants to file such a motion). The trustee's knowledge of Chiplease's direct payments has no bearing on Chiplease's obligation to comply with the escrow order. Chiplease and the trustee could not privately agree to modify a settlement agreement that was approved by court order; unlike a private contract, "an agreement whose every provision has been approved and therefore activated by court order requires court approval before it may be modified. *In re Heartland Steel, Inc.*, 389 F.3d 741, 745 (7th Cir. 2004).[4]

### 2. The District Court's Contempt Order

In connection with its appeal of the bankruptcy court's order to the district court, Chiplease asked the district court to stay the escrow order. The district court denied the motion on July 18, 2008, and ordered Chiplease to make the $500,000 deposit. Chiplease did not do so. A civil contempt hearing was convened, and the

---

[4] Chiplease briefly argues that the court's order violated its due-process rights; this argument is woefully undeveloped and need not be addressed. Chiplease also maintains that it was entitled to a trial on the issue because it submitted an affidavit from Connolly, RTC's president, insisting that Chiplease had complied with the agreement and order. Not true. It was undisputed that Chiplease did not establish the $500,000 escrow account as ordered. Chiplease offered an alternative theory of "compliance" that the bankruptcy court properly rejected.

district court held Chiplease in contempt and ordered it to pay a penalty of $5,000 a day until it complied with the escrow deposit requirement. Chiplease challenges the district court's contempt finding and also argues that the court should have reopened the proceedings to allow it to introduce additional evidence explaining its inability to pay.[5]

A district court may not enter an order of civil contempt unless it finds by clear and convincing evidence that a party has violated the express and unequivocal command of a court order. *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 751 (7th Cir. 2007). There is no dispute in this case that Chiplease did not comply with the district court's July 18 order or that this order constitutes an express and unequivocal command of the court. Instead, Chiplease says that it could not comply with the order because it lacked the financial resources to do so. Inability to pay is a valid defense in a contempt proceeding, but the party raising the defense has the burden of proving its inability to pay. *United States v. Rylander*, 460 U.S. 752, 757 (1983). There must be an adequate factual basis to support the defense, *S. Suburban Hous. Ctr. v. Berry*, 186 F.3d 851, 855 (7th Cir. 1999), and the alleged contemnor's past ability to comply with a

---

[5] As a preliminary matter, Chiplease attacks the district court's refusal to grant its motion for a stay of the bankruptcy court's order while it appealed the bankruptcy court's order. Ordinarily such a challenge becomes moot when the district court rules on the underlying appeal. *See Orion Sales, Inc. v. Emerson Radio Corp.*, 148 F.3d 840, 843 (7th Cir. 1998).

court order triggers a presumption that it has a present ability to comply, *e.g.*, *United States ex rel. Thom v. Jenkins*, 760 F.2d 736, 739 (7th Cir. 1985). Moreover, where, as here, there has been no effort at even partial compliance with the court's order, the inability-to-pay defense requires a showing of a "complete inability" to pay; stated differently, under the circumstances here, Chiplease had the burden of establishing "clearly, *plainly*, and *unmistakably*" that "compliance is *impossible*." *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) (citation omitted).

The record supports the district court's rejection of Chiplease's inability-to-pay defense. Chiplease submitted accounting documents from June and July 2008, which it claimed showed that it lacked the cash-on-hand necessary to comply with the bankruptcy court's order, and a perfunctory affidavit from Greenblatt, who stated that Chiplease's assets were illiquid. According to Greenblatt's affidavit, the money Chiplease held in its accounts belonged to other entities and was unavailable to pay its own debts.

The district court discounted Chiplease's evidence in light of the evidence from the February 2008 trial in the bankruptcy court regarding the Investment Trust's effort to assume the four landfill gas-conversion contracts. To persuade the bankruptcy judge that Chiplease stood ready and able to lend $3 million to the Trust, Greenblatt had testified that Chiplease's assets were between $15 and $16 million. Greenblatt had also testified that the net available to Chiplease was approximately $150,000 per month. Chiplease complains that it was improper for the district court to rely on Greenblatt's February 2008

trial testimony because the court only reviewed a partial transcript of that proceeding. But there is no indication that this resulted in any unfairness; Chiplease had the opportunity at the contempt hearing to introduce evidence explaining the differences between Greenblatt's affidavit and his trial testimony a few months earlier, but elected not to do so.[6] The evidence before the district court established that Chiplease had the past ability to comply with the escrow order, and Chiplease did little to rebut the resulting presumption that it had the present ability to comply. *See Thom*, 760 F.2d at 739. Chiplease failed to demonstrate that it had been "reasonably diligent and energetic in attempting to accomplish what was ordered," *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995) (citations omitted), and so did not carry its burden of producing sufficient evidence to establish its inability to pay. Accordingly, the district court did not abuse its discretion in holding Chiplease in contempt.

Nor did the district court abuse its discretion in denying Chiplease's motion to reconsider. Rule 59 requires a showing that the moving party discovered new evidence after trial that could not have been discovered by exercising due diligence before trial. FED. R. CIV. P. 59(a); *Envtl. Barrier Co.*, 540 F.3d at 608. Chiplease wanted

---

[6] Chiplease's objection to the district court's consideration of this evidence in the contempt proceeding is particularly suspect in light of its *own* reliance on this transcript in an earlier filing with the district court asking the district court to reconsider the order requiring Chiplease to make the $500,000 deposit.

the court to review eight new exhibits containing more information about its financial status, but Chiplease had plenty of time to compile these exhibits before the contempt hearing. The order to show cause gave Chiplease five-and-a-half weeks to prepare its case.

For the foregoing reasons, we AFFIRM the district court's order rejecting the Investment Trust's challenge to the bankruptcy court's refusal to approve the assignments of the four Peoria and Allied landfill contracts to the Trust. We also AFFIRM the district court's order rejecting Chiplease's challenge to the bankruptcy court's order regarding the escrow account. Finally, we AFFIRM the district court's contempt order. The trustee's request for an award of costs and attorney's fees on appeal is DENIED.