File Name:  11a0281n.06

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Nos.  09-1668, 09-1669, 09-1745

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| In re: A.P. LIQUIDATING CO., f/k/a APEX GLOBAL INFORMATION SERVICES, INC., | ) ) ) ) | |
| Debtor. | ) ) | **FILED**<br>**May 03, 2011**<br>LEONARD GREEN, Clerk |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS and THE LIQUIDATING AGENT of A.P. LIQUIDATING CO., | ) ) ) ) ) | |
| Plaintiffs/Appellants/Cross-Appellees, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| QWEST COMMUNICATIONS CORPORATION, | ) ) ) | |
| Defendant/Appellee/Cross-Appellant. | ) | |

Before:  MOORE, GIBBONS, and McKEAGUE, Circuit Judges.

**JULIA  SMITH  GIBBONS,  Circuit  Judge.**  The  Official  Committee  of  Unsecured Creditors of Apex Global Information Services, Inc. ("the committee") and McTevia & Associates, Inc., the liquidating agent of A.P. Liquidating Co., formerly known as Apex Global Information Services, Inc., (together, "the plaintiffs") appeal the dismissal of their action for contract breach under Federal Rule of Bankruptcy Procedure 7052.  Qwest Communications Corporation ("Qwest")

cross-appeals the district court's earlier order vacating the bankruptcy court's dismissal of the same action as barred by *res judicata*. For the following reasons, we affirm.

I.

Apex Global Information Services, Inc. ("AGIS") was a Nevada corporation formed in 1994 to provide internet access and other data communications services to national and regional internet service providers, telecommunications carriers, and businesses. Started by Phillip J. Lawlor, AGIS was created in response to the impending deregulation of the internet. AGIS, along with six other companies, agreed to be the initial participants in this commercialization of the internet; AGIS would serve as Tier I internet access provider, helping form what is commonly known as the "backbone" of the internet.

As part of its business plan, AGIS sought to acquire greater capability to transport internet traffic. To do so, it turned to Qwest, a regional telephone and telecommunications provider that was at the time completing a national fiber optic cable network. AGIS sought to purchase an indefeasible right of use ("IRU") on this network, which—in layman's terms—would give AGIS the right to use some of the space on Qwest's new network in order to transport its clients' electronic information. The plaintiffs claim that this new network would have essentially replaced AGIS's old data communications network, thus enhancing its growth as a Tier I internet platform and enabling it to become a low-cost, facilities-based provider of internet access and services.

In July 1997, AGIS and Qwest commenced negotiations, which culminated with an IRU purchase agreement executed on January 5, 1998, with an effective date of March 26, 1998. Under the agreement, the network's targeted date of completion was two years after the effective date.

AGIS, in turn, was required to make a cash payment of approximately $310 million roughly three years after the effective date. Qwest also was issued shares of common stock in AGIS equal to 19.99% of the total common stock, and Qwest received a seat on AGIS's board of directors.

The IRU agreement contained a provision known as a "most favored customer" clause ("MFC clause"), which provided:

> For a period beginning on the Execution Date and continuing for five years, the Cash Payment made by AGIS will be adjusted downward (and, after all payments due . . . have been made, Qwest will pay rebates to AGIS) to the extent necessary to assure that the rate extended to AGIS for the Capacity IRU under this Agreement will be not greater than Qwest's best prevailing rate on a Comparable Sale of capacity on the Qwest owned network during such period. A "Comparable Sale" will mean a sale of similar capacity or less on the Qwest System at the level at which AGIS is purchasing dedicated Bandwidth for a term of 20 years or less on Route Miles equal to or less than the Route Miles of the AGIS Network, and Qwest will not otherwise engage in any transaction in a manner designed or intended to circumvent the foregoing limitations.

The primary dispute in this case centers on this provision.

On February 25, 2000—one month before Qwest's target date for delivery of the network and more than a year before AGIS's earliest required payment date—AGIS filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. The United States Trustee appointed the unsecured creditors committee on March 17, 2000. The initial committee members were ITC DeltaCom Communications, AT&T Corp., Focal Communications Corp., and MCI WorldCom. Beginning in May 2000, however, proceeds from the approved sale of AGIS's assets were used to satisfy these creditors' claims. Because these debts were paid, all of the original creditors serving on the committee eventually resigned. AT&T, the last original committee member, resigned on July 31, 2007. Prior to its resignation, however, AT&T approved the appointment of three additional

Committee members—Argo Partners, Lynn Bateman, and Binder & Malter LLP—in accordance with the relevant procedures under the Debtor's Plan.

AGIS filed its Combined Plan for Reorganization on June 26, 2000. The reorganization plan named James V. McTevia & Associates, Inc., as AGIS's liquidating agent and appointed it to conduct the liquidation of the AGIS estate's remaining assets, to consummate the Plan, and otherwise administer the bankruptcy case post-confirmation on behalf of all creditors. The plan also called for AGIS to change its corporate name to "A.P. Liquidating Company." On August 9, 2000, the bankruptcy court entered an order confirming the plan.

Before the plan was confirmed by the bankruptcy court, however, Qwest filed a proof of claim against AGIS for $310 million, claiming breach of the IRU agreement. After the Committee filed an objection to Qwest's proof of claim in May 2001, however, Qwest moved to withdraw its claim, which the bankruptcy court granted on November 2, 2001.

On March 29, 2002, the committee and liquidating agent commenced an adversary proceeding on behalf of A.P. Liquidating against Qwest in the bankruptcy court, claiming Qwest was in fact the party who breached the IRU agreement. The plaintiffs claimed that other Qwest sales during the relevant period should have triggered the MFC clause, but that Qwest intentionally failed to disclose these sales to AGIS, in order to avoid consequential downward adjustment of the contract's price terms. As a result, according to the plaintiffs, AGIS had become hampered in its competition with other internet access providers and had been unable to raise working capital; moreover, AGIS's assets had been sold during bankruptcy proceedings at a much lower price than they would have otherwise.

Qwest first responded to the plaintiffs' claims by filing a motion to dismiss under Federal Rules of Bankruptcy Procedure 7012(b)(6) and 7009(b) on the grounds of *res judicata* and judicial estoppel. Qwest argued that, under the precedent of this circuit, a confirmed bankruptcy plan bars subsequent potential claims, unless they are specifically disclosed and reserved in the plan, which AGIS had not done. In October 2002, the bankruptcy court granted Qwest's motion to dismiss. In June 2003, the district court reversed the bankruptcy court and remanded the case for further proceedings. Finding the bankruptcy court's confirmation order "specifically reserved [AGIS's] right to explore any Objection against Qwest's Proof of Claim," the district court concluded that this reservation was enough to defeat *res judicata*.

After the district court remanded the case to the bankruptcy court, extensive discovery commenced. In August 2007, Qwest moved for dismissal on standing grounds.[1] Given payments of committee members' outstanding debts prior to this lawsuit's filing, Qwest argued that there was no properly constituted committee in existence when this lawsuit was commenced. As a result, Qwest claimed that no plaintiff had Article III standing before the court.[2] The bankruptcy court issued a bench ruling rejecting this argument and finding that it had subject matter jurisdiction in the case. The district court affirmed the bankruptcy court's finding of subject matter jurisdiction in April 2009.

---

[1] In April 2005, Qwest filed a motion to strike the plaintiffs' jury demand on the grounds that the plaintiffs' claims were subject to the bankruptcy court's equitable jurisdiction. In July 2005, the bankruptcy court granted Qwest's motion to strike the jury demand, finding the plaintiffs had no right to a jury trial. The plaintiffs appeal this decision; however, because we decide this case as a matter of law (for the reasons discussed below), the jury issue is moot.

[2] Because the liquidating agent is merely an agent of the committee, Qwest argued that the liquidating agent had no standing if the Committee was improperly constituted.

A bench trial began in late July 2007. At the close of the plaintiffs' presentation of evidence, Qwest moved pursuant to Federal Rule of Bankruptcy Procedure 7052 for judgment based on partial findings. After oral arguments, the bankruptcy court granted Qwest's motion. The district court affirmed the bankruptcy court's interpretation of the MFC clause and its judgment for Qwest. Both the bankruptcy court and the district court found that the MFC clause was unambiguous, and the "Comparable Sale" definition was restricted such that only sales "at the OC-48 level" were deemed comparable. Because Qwest had undisputedly made no other sales at the OC-48 level during the relevant period, there were no comparable sales and the MFC clause was therefore not triggered.

The plaintiffs appeal the denial of a jury trial and the judgment for Qwest on the merits of the contract dispute. Qwest cross-appeals the subject matter jurisdiction and *res judicata* issues.

II.

AGIS filed its Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code. 11 U.S.C. § 1101 *et seq.* Plaintiffs are authorized to bring and prosecute an action on behalf of the creditors of AGIS's bankruptcy pursuant to Paragraphs 6.3(a) through (c) of the reorganization plan approved by the bankruptcy court in August 2000. The bankruptcy court has jurisdiction over the current proceeding pursuant to the court's limited jurisdiction over non-core proceedings under 28 U.S.C. §§ 157(a), 157(c)(1), and 1334. The district court possesses original jurisdiction over the case pursuant to 28 U.S.C. § 1334. This court possesses appellate jurisdiction pursuant to 28 U.S.C. § 1291.

III.

This court must first address Qwest's claim that the plaintiffs lack Article III standing, since standing is a prerequisite to our jurisdiction. "Article III's standing requirements apply to proceedings in bankruptcy courts just as they do to proceedings in district courts." *In re Resource Tech. Corp.*, 624 F.3d 376, 382 (7th Cir. 2010). Jurisdictional challenges based on standing are reviewed *de novo* by this court. *Miller v. City of Cincinnati*, 622 F.3d 524, 531 (6th Cir. 2010).

Qwest's argument about the membership of the unsecured creditors committee does not raise a true issue of standing. Instead, Qwest has challenged certain committee members' respective fitnesses to serve on the committee of unsecured creditors. Such a challenge does not address the court's subject matter jurisdiction. Rather, the issue with regard to the composition of the committee relates to whether creditors are adequately represented. Qwest could have petitioned the bankruptcy court to "order the United States trustee to change the membership of [the creditors'] committee" and persuaded the court that "the change is necessary to ensure adequate representation of creditors." 11 U.S.C. § 1102(a)(4). Because Qwest has not done this, we have no occasion to examine the composition of the unsecured creditors committee at the time litigation was commenced.

As to the general issue of standing, this circuit has recognized that creditors committees can be granted "derivative standing" to pursue a variety of actions on behalf of the debtor or estate. *In re Trailer Source, Inc.*, 555 F.3d 231, 241 n.6 (6th Cir. 2009). Although this circuit has not held so explicitly, other circuits have found that the scope of "derivative standing" is broad enough to allow the committee to initiate adversary proceedings in bankruptcy court in place of the debtor-in-possession or trustee. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 566 (3d Cir. 2003) (en banc) ("[T]he most natural reading of the

[Bankruptcy] Code is that Congress recognized and approved of derivative standing for creditors' committees."); *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985) ("Most bankruptcy courts that have considered the question have found an implied, but qualified, right for creditors' committees to initiate adversary proceedings in the name of the debtor in possession."). The longstanding and widely accepted doctrine of derivative standing in cases such as these suggests that the constitutional requirement is satisfied, and Qwest has not put forward any reason for us to deviate from the established jurisprudence.

IV.

We next turn to the plaintiffs' appeal of the dismissal of the plaintiffs' action for breach of contract under Federal Rule of Bankruptcy Procedure 7052. "When reviewing an order of a bankruptcy court on appeal from a decision of a district court, this Court 'review[s] the bankruptcy court's order directly and give[s] no deference to the district court's decision.'" *LPP Mortg., Ltd. v. Brinley*, 547 F.3d 643, 647 (6th Cir. 2008) (quoting *In re Lee*, 530 F.3d 458, 463 (6th Cir. 2008)) (alterations in original). "The bankruptcy court's findings of fact are reviewed for clear error. Conclusions of law made by the bankruptcy court are reviewed de novo. Equitable determinations made by bankruptcy courts are reviewed for an abuse of discretion." *Id.* (internal citations omitted).

The bankruptcy court's grant of Qwest's Rule 7052 motion is based on interpretation of the contract. The IRU Agreement provides, and the parties agree, that the contract is governed by Delaware law. Under Delaware law, "[t]he proper construction of any contract . . . is purely a question of law." *Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008)

(quoting *Rhone-Poulenc Basic Chems., Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)) (internal quotation marks omitted; alterations in original). "However, insofar as the court below relied upon parol evidence to aid in its interpretation of [a contract], its factual findings are entitled to greater deference." *Judge v. Rago*, 570 A.2d 253, 255 (Del. 1990) (citing *Levitt v. Bouvier*, 287 A.2d 671 (Del. 1972)). This accords with the federal rule that an appeals court "review[s] the bankruptcy court's findings of fact for clear error and any conclusions of law *de novo*." *In re John Richards Homes Bldg. Co., L.L.C.*, 439 F.3d 248, 254 (6th Cir. 2006).

The first question is whether the relevant contractual term—the "comparable sale" definition found within the MFC clause—is unambiguous as it relates to this dispute. Under Delaware law this court must review this question *de novo*. *See Hifn, Inc. v. Intel Corp.*, No. 1835-VCS, 2007 WL 2801393, at *9 (Del. Ch. May 2, 2007) (unpublished) ("A determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law."). The comparable sale provision explains that:

> A "Comparable Sale" will mean a sale of similar capacity or less on the Qwest System at the level at which AGIS is purchasing dedicated Bandwidth for a term of 20 years or less on Route Miles equal to or less than the Route Miles of the AGIS Network, and Qwest will not otherwise engage in any transaction in a manner designed or intended to circumvent the foregoing limitations.

A natural reading of the provision, therefore, identifies four conditions that must be satisfied before a Qwest sale is deemed comparable to the AGIS sale: (1) the sale must be for "similar capacity or less," (2) the sale must be "at the level at which AGIS is purchasing bandwidth"; (3) the sale must be for "a term of 20 years or less"; and (4) the sale must be "on Route Miles equal to or less than Route Miles of the AGIS Network." The two parties agree on the definitions of the last two

conditions, and these are irrelevant to the current dispute. The central disagreement is over the first two conditions within the provision, and specifically the definitions of "capacity" and "level."

Qwest argues that "level" relates to the bandwidth being purchased, as in "level of bandwidth." Level, it argues, indicates the rate of transmission, or how much data is conveyed per second. This metric essentially determines how much data is conveyed from point A to point B at one time. Capacity, in contrast, is comprised of two components: (1) the rate (*i.e.*, the bits per second) of transmission the network could provide and (2) the distance over which it would be provided. According to Qwest, therefore, level is only one component of capacity.

The plaintiffs, in contrast, argue that "capacity" and "level" are synonymous terms, and both refer to the rate of transmission.[3] The plaintiffs therefore argue that there are really only three conditions that have to be satisfied before a condition is deemed a "comparable sale," not four as the plain language of the provision would suggest. Thus, in the plaintiffs' view, any Qwest contract for network capacity at a rate lower than OC-48 over a distance equal to or less than the Qwest network for a period of twenty years or less would have triggered the MFC clause.

The plaintiffs' offered interpretation, however, runs afoul of the doctrine under Delaware law that "[a]s a general matter, . . . courts attempt to interpret each word or phrase in a contract to have an independent meaning so as to avoid rendering contractual language mere surplusage." *Majkowski*

---

[3] Plaintiffs support their claim of synonymity by pointing to what they claim are the industry terms of "capacity" and "bandwidth." While § 17.3(b) of the IRU Agreement provides that "words having well known technical or trade meanings will be so construed," under contract law this type of evidence is considered parol evidence and cannot be used to introduce ambiguity into a contract. *Eagle Indus. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

*v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006). The logic behind this doctrinal rule is simple: "[o]rdinarily, one presumes that drafters who choose different words have intended to implement different concepts." *Argyle Solutions, Inc. v. Prof'l Sys. Corp.*, No. 4382-VCN, 2009 WL 1204351, at *2 (Del. Ch. May 04, 2009); *see also Conwell's Lessee v. Conwell*, 1 Def. Cas. 72, 72 (Del. 1795) ("Having used different words, he must have had different meanings."). Because the drafters used "level" and "capacity" in the same provision, Delaware law presumes the two terms to have separate meanings.

Unfortunately, Qwest's proffered interpretation of the comparable sales doctrine seems to have its own, albeit lesser, surplusage-creating consequence. Since Qwest argues that capacity is comprised of (a) distance and (b) rate of transmission, then there is redundancy in the comparable sales definition; if the rate of transmission is always fixed—in other words, always OC-48—then the capacity of a second Qwest-provided network will be less than that of the AGIS network only if the network's distance is less than or equal to that of the AGIS network. Going back to the four conditions outlined above, there is no scenario where condition (1) could be satisfied and condition (2) not, or vice versa. This inherent equivalency of terms, it seems, amounts to surplusage.

The admitted redundancy in Qwest's definition, however, does not necessarily mean that its meaning is not correct or that the contract itself is ambiguous; indeed, this may simply be the exception to the general rule about surplusage.[4] *Cf. Lamie v. United States Tr.*, 540 U.S. 526, 536

_____

[4] In contrast, the plaintiffs concede that their proffered interpretation cannot be supported as a reading of an unambiguous statute. The plaintiffs claim the confusion over the definition of "capacity" and "level" is due to "an oversight on the part of the drafters." Specifically, the plaintiffs argue that, as a result of negotiations, the parties intended to change the prepositional phrase "*at* the level" to "*than* the level" in the final version of the IRU agreement, such that a comparable sale would have been one with "similar capacity or less on the Qwest System at the level at which AGIS

(2004) ("Surplusage does not always produce ambiguity and our preference for avoiding surplusage constructions is not absolute.") In this case, the surplusage of Qwest's proffered definition seems explainable; it is included to emphasize that *only* OC-48 networks are considered comparable to the AGIS network. This emphasis has an obvious purpose in the telecommunications industry: because the technologies behind different network lines vary and are rapidly evolving, there is an inherent need to limit what types of technologies are "comparable." In this case, the plain language of the MFC clause limits that scope by restricting comparable sales to those using the same technology as the AGIS network.

Moreover, Qwest's interpretation of "level" as connoting "OC-48 level" finds support within other portions of the IRU Agreement. In § 2.1, the agreement defines "Capacity" (with a capital "C," in contrast to the lower-cased "capacity" used in the MFC clause) as "optical transmission capacity at an OC-48 level." In this provision, "level" quite clearly is used to identify the OC-48 bandwidth, and the term "capacity" and "level" are not used synonymously. The clear context in which level is used in § 2.1, then, clarifies some of the uncertainty within the "comparable sales" provision in § 9.2(c). *Cf. Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places . . . is generally read the same way each time it appears.").

Finally, reading the "comparable sales" provision to be limited to networks with OC-48 lines finds support in the general economic purpose of an MFC clause. A most-favored customer clause is included to eliminate a consumer's worry that should she wait until tomorrow to purchase a seller's product, she would get a better price. An MFC clause therefore operates as insurance, but

---

is purchasing."

it is intended to insure against a very narrow set of risks—those that affect the price of the very product a consumer intends to buy, not those that affect the price of substitutable products. The construction offered by the plaintiffs, in contrast, effectively makes the MFC clause a protection against price fluctuations in all substitutable telecommunications technologies—a much broader form of insurance. It seems unlikely that the parties intended for Qwest to provide such broad assurances within an MFC clause.

In sum, the plain language and grammatical structure of the MFC provision, the use of "level" and "capacity" non-synonymously in other parts of the IRU Agreement, and the underlying rationale of a most-favored customer clause all establish unambiguously that only sales at the OC-48 bandwidth were intended to be comparable sales that triggered the MFC provision.[5]

V.

For the foregoing reasons, we affirm the bankruptcy court's grant of judgment to Qwest based on partial findings and its denial of Qwest's motion to dismiss based on lack of standing.

---

[5] Because we find for the defendants on the merits of the case, Qwest's motion for summary judgment based on *res judicata* is moot.